[No. S006359. Dec. 18, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LELAND DELLINGER, Defendant and Appellant.

COUNSEL

Richard P. Siref, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, M. Howard Wayne, Robert M. Foster, Pat Zaharopoulos and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGELSON, J.**—We granted review in this case to determine whether CALJIC No. 8.11 (1983 rev.) (4th ed. pocket pt.), the standardized instruction defining implied malice, adequately informs the jury that implied malice requires a finding of the defendant's subjective awareness or appreciation of the life-threatening risk created by his conduct. For the reasons set forth hereafter, we conclude that it does.

Although we hold that the "wanton disregard for human life" definition of implied malice embodied in the 1983 revision of CALJIC No. 8.11 independently conveys the "subjective awareness" requirement to the jury, we are nevertheless persuaded that, by contemporary standards, it is a superfluous charge. The better practice in the future is to instruct juries solely in the straightforward language of the second definition in that instruction—that malice is implied when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. (*People* v. *Phillips* (1966) 64 Cal.2d 574, 587-588 [51 Cal.Rptr. 225, 414 P.2d 353]; see also CALJIC Nos. 8.11 and 8.31 (5th ed. 1988 bound vol.).)

I

At his first trial, a jury found defendant guilty of the first degree murder of his two-year-old stepdaughter, Jaclyn Z. The trial court reduced the conviction to second degree murder, and it was ultimately reversed. (*People* v. *Dellinger* (1984) 163 Cal.App.3d 284 [209 Cal.Rptr. 503].) On retrial, the jury convicted defendant of second degree murder. The following facts were established at the second trial:

On the evening of May 29, 1979, two-year-old Jaclyn Z. died at St. Joseph's Hospital in the City of Orange. An autopsy revealed the cause of death to be a fractured skull and swelling of the brain due to blunt-force trauma to the head. The toxicology report further revealed the presence of cocaine in Jaclyn's blood and liver, and a very large, potentially fatal dose in her stomach. The forensic pathologist who performed the autopsy opined that ingestion of cocaine was a contributing cause of death.

A second autopsy revealed a contusion of the child's cervical spinal cord. Forensic pathologist Thomas Noguchi testified that the skull fracture could have resulted from a forceful blow delivered by a hand. Pediatrician David Chadwick, an expert on child abuse, testified that Jaclyn's skull fracture did not result from a fall down the carpeted stairs of defendant's apartment.

Neurosurgeon Eldon Foltz, called by the defense, testified that in his opinion the head injury could have resulted from a fall down the carpeted stairs and was "highly unlikely" to have been caused by a hand-delivered blow.

Jaclyn lived with defendant, who was her stepfather, and her mother Dianne, in a split-level apartment. When Dianne got home from work on the day of Jaclyn's death, defendant told her to hurry upstairs because the child had been hurt. Defendant was administering mouth-to-mouth resuscitation to Jaclyn in the kitchen and had telephoned for help. He told Dianne he had picked up Jaclyn from the landing in the middle of the stairway after hearing a noise.

At one point defendant looked at the unconscious child, banged the kitchen counter with his fists, and stated in an angry tone: "Jackie, why are you doing this to me?" When Dianne asked, "What do you mean what did she do to you? She [is] trying to stay alive. I don't understand." Defendant made no reply.

Paramedics shortly arrived on the scene. En route to the hospital, defendant told Dianne that he had given Jaclyn some wine in a baby bottle, stating: "It doesn't matter now, they're going to find it anyway."

Later that evening, after Jaclyn died, defendant and Dianne returned to their apartment. Dianne saw a baby bottle three-quarters full of wine on top of the refrigerator. She asked defendant why he would give a two-year-old child wine in a baby bottle. He stated Jaclyn was being "fussy" and he was "trying to calm her down." Dianne poured the baby bottle of wine down the kitchen sink.

A few days later, Dianne discovered that all of Jaclyn's baby bottles were missing. Defendant admitted to her that he had thrown them away.

City of Orange Detective Bruce Praet testified that defendant told him he had been preparing dinner when he heard a "thud" coming from the area of the staircase. He found Jaclyn at the bottom of the stairs, unconscious and having difficulty breathing.

Betty Krauss, Jaclyn's regular daytime babysitter, testified that one day in April 1979, she observed a black-and-blue handprint—shaped bruise on the child's lower back-upper buttocks area. When defendant picked up Jaclyn on that date he told Krauss "that he had a real rough night, that [Jaclyn had] been up off and on all night, and that he had whipped her and that he had realized in the morning that he had done it much harder than he had anticipated."

## II

The jury was instructed on implied malice in the language of CALJIC No. 8.11 (1983 rev.) (4th ed. pocket pt.), which in relevant part provides: "Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life *or* when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (Italics added.) Second degree murder was defined for the jury using virtually identical language. (CALJIC No. 8.31 (1983 rev.) (4th ed. pocket pt.).)

Defendant objects to inclusion of the first definition in the instruction, which directs the jury to find implied malice "when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life." He argues that this language allowed the jury to find implied malice without determining that he subjectively appreciated the life-threatening risk which his conduct posed to his stepdaughter Jaclyn's life. The Court of Appeal agreed, finding that the phrase "wanton disregard for human life" is confusing because "wanton" is nowhere defined in the instruction and does not convey a knowing or conscious appreciation of the risk to human life.

We conclude that the "wanton disregard for human life" definition of implied malice does adequately convey to the jury that defendant need be shown to have subjectively appreciated the life-threatening risk created by his conduct.

In *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279], this court restated the rule that the element of malice aforethought necessary for a conviction of second degree murder may be implied. We expressly reaffirmed that "a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk [to human life] involved, i.e., a *subjective* standard. (*People* v. *Phillips, supra,* 64 Cal.2d at p. 588.)" (*Watson, supra,* 30 Cal.3d at pp. 296-297, italics in original.)

The statutory definition of implied malice has never proved of much assistance in defining the concept in concrete terms. Penal Code section 188 simply provides that: "[Malice] is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

Prior to *Watson,* two definitions evolved to describe the mental state required for a finding of implied malice. Each formulation attempted to define the concept in tangible terms a jury could understand and apply.

Thus, in *People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1] (Traynor, J., conc.), we construed the "abandoned and malignant heart" statutory definition of implied malice as that state of mind where "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (See also *People* v. *Poddar* (1974) 10 Cal.3d 750, 756-757 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130]).

In *People* v. *Phillips, supra,* 64 Cal.2d at page 587, we phrased the definition a different way, holding that malice is presumed when " 'the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (See also *People* v. *Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913].)

Critically, however, nothing in these seminal decisions suggested that the "*wanton* disregard for human life" definition did not connote a "*conscious* disregard for life"—and thus a *subjective* awareness or appreciation of the risk created. (See, e.g., *People* v. *Washington, supra,* 62 Cal.2d at pp. 780, 782 [referring interchangeably to the "conscious disregard for life" standard and the "wanton disregard for human life" standard as alternative formulations of a definition of implied malice].) It was clear from our holding in *Washington* that under either test, a finding of implied malice required a showing of defendant's awareness of the risk to life created by his conduct. In *Phillips* we criticized utilization of the statutory term "abandoned and malignant heart" in a jury instruction, explaining it might "encourage the jury to apply an objective *rather than subjective standard* in determining *whether the defendant acted with conscious disregard of life.* . . ." (*Phillips, supra,* 64 Cal.2d at p. 588, italics added.)

This state of the law of implied malice was reiterated in *People* v. *Watson, supra,* 30 Cal.3d 290. We expressly reaffirmed that "a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk [to human life] involved, i.e., a *subjective* standard. [Citation]." (*Watson, supra,* 30 Cal.3d at pp. 296-297, italics in original.) We went on to define implied malice in *Watson* as follows: "[S]econd degree murder based on implied malice has been committed when a person does an act, the natural consequences of which are dangerous to life, which act was deliber-

ately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . . (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 719, quoting from *People* v. *Phillips, supra,* 64 Cal.2d 574, 587 [internal quotation marks omitted].) *Phrased in a different way,* malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. (*People* v. *Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130].)" (*Watson, supra,* 30 Cal.3d at p. 300, italics added.)

*Watson* thus made it abundantly clear that the two definitions of implied malice which evolved in the aforementioned cases articulated one and the same standard.

However, the drafters of CALJIC No. 8.11 (1983 rev.) (4th ed. pocket pt.) substituted the disjunctive "or" for our transition "[p]hrased in a different way" in *Watson.* Several appellate decisions criticized the revised instruction as confusing and susceptible of the interpretation that there are different tests for implied malice, the first of which—"wanton disregard for human life"—does not convey the "subjective awareness of the risk" requirement. (See, e.g., *People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 162-164 [246 Cal.Rptr. 915]; *People* v. *James* (1987) 196 Cal.App.3d 272, 290-291 [241 Cal.Rptr. 691].)

Another line of cases concluded that the "wanton disregard for human life" definition of implied malice independently conveys the "subjective awareness" requirement. (See, e.g., *People* v. *Benson* (1989) 210 Cal.App.3d 1223, 1228-1231 [259 Cal.Rptr. 9]; *People* v. *Rosenkrantz* (1988) 198 Cal.App.3d 1187, 1203 [244 Cal.Rptr. 403] [upholding instruction where the only definition of implied malice read to the jury was that utilizing the terms "wanton disregard for human life" and "base antisocial purpose"]; *People* v. *Flores* (1986) 178 Cal.App.3d 74, 80 [223 Cal.Rptr. 465] [same].)

■ Viewing the language of the "wanton disregard" definition as a whole, a reasonable juror would understand that one who acts "with a base antisocial motive and with a wanton *disregard* for human life" necessarily acts with *knowledge* of the life-threatening harm that might occur if he proceeds with "an act with a high probability that it will result in death." The noun "disregard" has been defined as describing the circumstance where a lack of attention is "intentional" or "willful." (Webster's New Internat. Dict. (3d ed. 1981) p. 655; The American Heritage Dict. (2d ed. 1982) p. 408.)

The court in *People* v. *Benson, supra,* 210 Cal.App.3d 1223, concluded that the "wanton disregard for human life" definition "necessarily encom-

pass[es] an evaluation of the defendant's subjective state of mind." (*Id.* at p. 1230.) As that court aptly observed: "How can an individual wantonly *dis*regard a fact without having regarded it in the first instance?" (*Id.* at p. 1230, fn. 4, italics in original.)

■ "Moreover, although the term 'wanton' may not be common parlance, it is defined . . . in the common law as involving an element of 'consciousness of one's conduct' and 'realization of the probable injury to another.' (*Albers* v. *Shell Company* (1930) 104 Cal.App. 733, 750 [286 P. 752], disapproved on other grounds in *Meyer* v. *Blackman* (1963) 59 Cal.2d 668, 676 [31 Cal.Rptr. 36, 381 P.2d 916]; accord *People* v. *Schumacher* (1961) 194 Cal.App.2d 335, 340 [14 Cal.Rptr. 924]; *People* v. *McNutt* (1940) 40 Cal.App.2d Supp. 835, 837 [105 P.2d 657].)" (*People* v. *Benson, supra,* 210 Cal.App.3d at p. 1230.)

Black's Law Dictionary defines "wanton" as used in the term "wanton injury" to mean: "Injury produced by *conscious* and *intentional* wrongful act, or omission of *known duty* with reckless indifference to consequences. *It must be predicated upon actual knowledge of another's peril* and a failure to take available preventative action knowing that such failure will probably result in injury. Rainey v. State, 31 Ala.App. 271, 17 So.2d 683, 686." (Black's Law Dict. (5th ed. 1979) p. 1419, italics added.)

■ The same source defines "wantonness" as: "*Conscious doing of some act* or the omission of some duty *with knowledge of existing conditions and consciousness that, from the act or omission, injury will likely result to another.* Bedwell v. DeBolt, 221 Ind. 600, 50 N.E.2d 875, 877. *Conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril,* or under circumstances where he is charged with a knowledge of such peril, and *being conscious of the inevitable or probable results of such failure.* Stout v. Gallemore, 138 Kan. 385, 26 P.2d 573. A reckless or *intentional disregard of the property, rights, or safety of others,* implying, actively, *a willingness to injure and disregard of the consequences to others,* and, passively, more than mere negligence, that is, *a conscious and intentional disregard of duty.* " (Black's Law Dict., *supra,* at p. 1419, italics added.)

██    We therefore conclude that the "wanton disregard for human life" definition of implied malice would be understood by a reasonable juror to independently require a finding of the defendant's subjective awareness of the life-threatening risk. It was not error to instruct the jury below in the language of the 1983 revision of CALJIC Nos. 8.11 or 8.31.[1]

We nevertheless believe that, by contemporary standards, the "wanton disregard for human life" standard has become a superfluous charge. We reached a similar conclusion in *Phillips* respecting the "cryptic statutory requirement of an 'abandoned and malignant heart.'" (*Phillips, supra,* 64 Cal.2d at p. 586.) We explained in that case that: "The presence of the metaphysical language in the statute does not compel its incorporation in instructions if to do so would create superfluity and possible confusion. In its origin the language did no more than phrase a companion or alternative description of a conscious disregard of life; since the instruction here specifically sets forth the latter, the former merely duplicates it." (*Id.* at p. 588.) We concluded that "[t]he dangers inherent in [use of the 'abandoned and malignant heart' language] and the absence of any compensating advantage impel us to suggest its replacement with the more comprehensive and informative charge . . . in the form that we have submitted." (*Ibid.*)

The term "*wanton* disregard for human life" is not as "cryptic" as the phrase "abandoned and malignant heart." As we have shown, the term "wanton" has various applications connoting *conscious* or *knowing* acts, and is firmly rooted in the common law. Still, the term is not in common use in contemporary daily speech, and there remains the possibility that many laypersons will be unfamiliar with its meaning. We see no "compensating advantage" to the continuing use of obscure phraseology to instruct jurors on the complexities of homicide law. (*Phillips, supra,* 64 Cal.2d at p. 588.)

The better practice in the future is to charge juries solely in the straightforward language of the "conscious disregard for human life" definition of implied malice. To this end, we note that the most recent revisions of

---

[1] Although we find no error in the giving of CALJIC No. 8.11 (1983 rev.) (4th ed. pocket pt.), several Court of Appeal opinions have recognized the potential for exploitation of the two-pronged instruction when combined with *affirmative arguments* to the jury that defendant could be found guilty of second degree murder even without subjective awareness of the risk to human life created by his conduct. (See, e.g., *People* v. *Benson, supra,* 210 Cal.App.3d at p. 1230; *People* v. *Protopappas, supra,* 201 Cal.App.3d at pp. 163-164.)

No such affirmatively misleading argument occurred in this case. The record shows that the prosecutor used the terms "*wanton* disregard" and "*conscious* disregard" interchangeably, thus equating them. In reviewing the facts in his closing argument, he weaved in the "subjective awareness" requirement, utilizing language from both definitions of implied malice.

CALJIC Nos. 8.11 and 8.31 (5th ed. 1988 bound vol.) exclusively adopt such a definition, eliminating any reference to the "wanton disregard for human life" test for implied malice. CALJIC No. 8.11 now provides, in pertinent part, that: "Malice is implied when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (See also CALJIC No. 8.31 (5th ed. 1988 bound vol.).)

We approve of this newly revised implied malice instruction, and agree with the CALJIC committee's conclusion that the "conscious disregard for human life" definition, standing alone, is "more comprehensible to the average juror." (See comment following CALJIC No. 8.11 (5th ed. 1988 bound vol.).)

■ We note that the evidence introduced below overwhelmingly established the element of implied malice necessary to support defendant's conviction of second degree murder. The fact that two-year-old Jaclyn was in defendant's care when the fatal injuries were sustained, the handprint bruise left by defendant on the child's body one month before the incident, the skull fracture and other severe head injuries which caused death, defendant's act of giving her wine in a baby bottle on the afternoon of her death, and the presence of a potentially fatal dose of cocaine in the child's body, combined with the expert testimony to establish the requisite mental state. In view of the evidence, the jury reasonably rejected the defense that Jaclyn's death resulted from an accidental fall down the carpeted stairs.[2]

---

[2] The dissenting opinion concludes that, "In the circumstances of the instant case, there is a substantial likelihood that the jury under the 'wanton' instruction concluded that malice was implied on the basis of reckless behavior of defendant whether or not decedent's fracture was caused by a fall down the stairs." (*Post,* at p. 1228.)

We have concluded there was no instructional error in the giving of CALJIC Nos. 8.11 or 8.31 (1983 rev.) (4th ed. pocket pt.). Assuming arguendo we had found such error, and thus had occasion to assess its prejudicial impact, if any, we would still be in sharp disagreement with the dissent's conclusions in that regard. Critically, the jury here was further instructed pursuant to CALJIC No. 8.51 [Murder and Manslaughter Distinguished—Nature of Act Involved] (1983 rev.) (4th ed. pocket pt.) as follows: "There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing such a dangerous act in an unlawful or criminally negligent manner without realizing the risk involved, he is guilty of manslaughter. *If, on the contrary, he had realized the risk and acted in total disregard of the danger to life involved,* malice would be implied and he could be guilty of murder." (Italics added.)

Given the instructions as a whole (cf. *People* v. *Sedeno, supra,* 10 Cal.3d at p. 721), and the jury's rejection of a manslaughter verdict thereunder, we would not conclude, as does the dissent, that the jurors in this case may have been misled by the implied malice instructions to defendant's detriment.

CONCLUSION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Panelli, J., Kaufman, J., and Kennard, J., concurred.

**BROUSSARD, J.**—I dissent. The majority conclude that the "wanton disregard of human life" definition of implied malice required a finding of the defendant's subjective awareness of the life threatening risk and that there was no error in instructing the jury in the language of the 1983 revision of CALJIC Nos. 8.11 or 8.31. The majority rely on several cases which use language the same as or similar to the quoted phrase.

However, our concern is not with legal definitions and precedents to define the term. We must view the instruction as "a reasonable juror could have interpreted the instruction." (*Sandstrom* v. *Montana* (1978) 442 U.S. 510, 514 [61 L.Ed.2d 39, 45, 99 S.Ct. 2450].) When this is done, it is clear that the quoted phrase encompasses cases not only where defendant realized the risk but also where he acted recklessly violating his duty to care for the child even though he did not realize the risk of his conduct. Moreover, the balance of the instruction, stating "conscious" disregard of the risk as an alternative to "wanton" disregard of the risk, made it likely that a jury would understand that two tests were stated and only one required subjective awareness of the risk. In the circumstances of this case, where the evidence was not only sharply conflicting but was also subject to conflicting inferences and where the jury engaged in lengthy deliberations and focused on the instruction, the error must be held prejudicial.

The instruction provided: "Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a *wanton disregard* for human life when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who *knows* that his conduct endangers the life of another and who acts with *conscious disregard* for life." (CALJIC No. 8.11 (1983 rev.) (4th ed. pocket pt.), italics added.) The definition of second degree murder used virtually identical language. (CALJIC No. 8.31 (1983 rev.) (4th ed. pocket pt.).)

It is settled that "a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard. (*People* v. *Phillips* [(1966)] 64 Cal.2d [574,] 588 [51 Cal.Rptr. 225, 414 P.2d 353].)" (*People* v. *Watson* (1981) 30 Cal.3d 290, 296-297 [179

Cal.Rptr. 43, 637 P.2d 279], italics in original.) Although the word "disregard" includes rejection after appreciation or consideration, it is not limited to such rejection but is also often used in a broader sense where there has been no subjective awareness to mean "to give no thought to: to pay no attention to." (See Webster's New Internat. Dict. (3d ed. 1961) p. 655.) Thus the term "disregard for life" encompasses not only situations where the actor subjectively appreciates the risk to life but also where the risk is not contemplated or appreciated. The word "wanton" does not eliminate or even reduce the danger that a jury might imply malice when it was of the view that the defendant did not appreciate the risk to life.

The danger is accentuated because in the second part of the instruction the jury is told that it may imply malice on the basis of knowledge of the risk and "conscious disregard" for life and this second definition is separated from the first by an "or." While the use of the word "or" does not necessarily mean that the instruction contains two differing definitions of malice, the instruction viewed as a whole certainly implies that there are two definitions stated in the alternative. (See e.g., *Houge* v. *Ford* (1955) 44 Cal.2d 706, 712 [285 P.2d 257].) The prosecutor in his argument said there were two. Both instructions are concerned with "disregard" for life; one adds the element of knowledge and modifies disregard with "conscious," while the other modifies with "wanton" and adds the elements of a high degree of probability of death and a "base antisocial purpose." The jury that focuses on the definitions can only conclude that while they may and do overlap they are different and the difference lies in the difference between "wanton," on the one hand, and "conscious" and the knowledge requirement on the other.

Although the difference may not be strikingly apparent and perhaps is a subtle one when the instructions are read to the jury, the difference must be viewed as apparent to the jury when, as here, the jury after two days of deliberation specifically asks for a written copy of the instruction and has it in the jury room to study during the next two days of deliberations.

There are cases, as the majority point out, that have phrased the definition of implied malice in terms of "wanton disregard" and cases which have treated the "wanton disregard" definition as the same as the "conscious disregard" definition. (Maj. opn., *ante*, at pp. 1218-1219.) It is unclear whether the courts were erroneously suggesting that malice may be found on an objective basis or whether they failed to appreciate that the "wanton disregard" standard would permit conviction of murder not only where the defendant is conscious of the risk to life but also where he did not turn his mind to the obvious risk.

In any event, our function is not to interpret the instruction on the basis of legal precedent. Rather, we must interpret the instruction as a reasonable juror could have interpreted it. (*Sandstrom* v. *Montana, supra,* 442 U.S. 510, 514.) The cases relied upon by the majority may not be held to authorize convictions of second degree murder for persons who did not actually appreciate the risk to human life involved. Because the plain language of the instruction does so, it is erroneous. (*People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 162-164 [246 Cal.Rptr. 915]; *People* v. *James* (1987) 196 Cal.App.3d 272, 290-291 [241 Cal.Rptr. 691].) The fact that the instruction also authorizes proper convictions does not save it.

The determination whether the error was prejudicial in the instant case involves evaluation of the danger that under the evidence the jury would convict defendant of murder even though it believed that he did not appreciate the risk of his conduct.

Defendant testified that he picked up his two-year-old stepdaughter, Jaclyn, from the babysitter after work and took her home. She had been fussy, and he gave her a small amount of wine in a baby bottle. While she was on the couch watching television he went into the kitchen and began to prepare dinner. He heard a loud noise, ran out of the kitchen area, and saw Jaclyn at the middle landing of the stairs. Finding that she was not breathing, he started using mouth-to-mouth resuscitation, and called for aid. He denied giving Jaclyn any cocaine or having any cocaine in the house.

The paramedics came and took Jaclyn to the hospital where a surgeon sought to relieve the pressure on the brain by drilling holes in the skull. The medical personnel were unsuccessful, and she died a little over an hour and a half after the paramedics arrived at defendant's home.

Death was due to injury of the brain causing swelling with portions of the brain being forced through the surgical incisions. There was also a fracture of the back of the skull which all of the doctors either said or assumed was related to the brain injury. The expert witnesses also agreed that the impact causing the fracture was due to a padded instrumentality because of the limited amount of external bruising. The expert witnesses further agreed that a great amount of force was required to cause the fracture because it was caused by impact with a padded instrumentality and occurred in the thicker part of the skull. About a year after the death, the body was exhumed and a cervical injury was found.

Chemical analysis showed a small amount of alcohol in the body. Cocaine was found in the stomach in the amount of 25 milligrams and in the liver in the amount of 1.5 micrograms. Although a radio-immuno assay test

indicated cocaine in the blood, the gas chromatogram, which is accurate to 50 nanograms, detected no cocaine in the blood. The autopsy surgeon testified that according to his office's practices the minimum fatal range for cocaine ingestion was considered between 0.1 and 20 micrograms per gram of tissue level. The doctor said that because the amount of cocaine found in the liver was within the range, cocaine was a possible cause of death. In addition, he said that because cocaine speeds up the heartbeat, it could be a contributing cause since the ultimate cause was heart failure. The doctor conceded that the amount of cocaine found could be ingested without a fatal reaction.

He further testified that when cocaine is absorbed through the mucus membrane of the mouth or nose, absorption can be achieved within a 30- to 40-minute period. Absorption through the stomach is a little slower with the peak level achieved at approximately the one hour level. As cocaine is absorbed it is broken down into its basic components. When cocaine is absorbed into the blood, it is distributed and will stimulate the brain. Although his testimony as to absorption appears to show that the cocaine was ingested shortly or immediately before death because none was found in the blood and almost all remained in the stomach, he stated that his findings were consistent with cocaine ingestion shortly before the skull fracture. On cross-examination, he said that the cocaine could have been ingested after the fracture. However, on neither direct nor cross-examination on this subject was the doctor's attention called to the fact that decedent survived for more than one and one-half hours after the skull fracture.

The autopsy surgeon testified that the brain injury was not caused by shaking the child because, if it had been, there would be bruising on both sides of the brain and no bruise was found on the side of the brain opposite the injured side. He did not testify as to the cause of the fracture.

The prosecution and the defense each presented two eminent doctors to testify with respect to the cause of the skull fracture. Dr. Noguchi was chief medical examiner with the Los Angeles County Coroner's office and has an international reputation as a forensic pathologist, teaching and lecturing in many places. Dr. Chadwick is a pediatrician from San Diego, has academic credentials and has written extensively on child abuse. They both concluded that the fracture was not caused by striking the head on the edge of one of the carpeted stairs because the height of the stairs was not sufficiently great to develop sufficient force to cause the fracture. Dr. Noguchi added that bruises to the knees and elbows which would be expected in a fall down the stairs were not found. He said a blow delivered by hand with great force could have caused the injury. While Dr. Chadwick stated that a blow delivered by hand could possibly have caused the injury, it was more likely

to occur as a result of decedent being slammed hard against a carpeted surface. Although such would not explain the cervical injury, that injury might have been caused by shaking the child. The doctor also said that the injuries could have been inflicted by slamming the child against a wooden chair covered by a towel.

Doctor Foltz is professor of neurosurgery at the University of California, Irvine, was a founding member of the International Pediatric Neurosurgery Society, author of one hundred and ten papers over twenty-two years, and during the last five years had three or four pediatric head trauma cases per month. Doctor Root, who worked for the San Bernadino County Coroner's office, had performed over 15,000 autopsies, provided one of the 37 resident training programs approved in the United States, and was an associate clinical professor of pathology at Loma Linda University Medical Center. The defense doctors rejected the claim that the fracture could have been caused by a blow from the hand. They stated that for a hand blow to generate enough force to cause the fracture the head would have to be held rigid and then there would be bruises at the place where the head was held. In the absence of rigidity the body would absorb much of the force resulting from the padded instrumentality preventing fracture. There were no bruises that would have been necessary if the head had been held rigid. Dr. Foltz said he had treated several children with similar fractures resulting from falls from high chairs. He did not indicate whether the fractures were caused by the head striking the high chair or the floor.

The defense experts were of the view that the fracture could have been caused by decedent falling and striking the edge of a stair.

In determining whether the error in instructing on implied malice was prejudicial, it is probable that if the jury found that defendant caused the fracture by hitting decedent with the great amount of force required to cause the fracture with a padded instrument, it would further infer that defendant knew of the risk of death whether defendant hit her with his hand, threw her on the floor, smashed her against the towel-covered chair, or some other active conduct developing the great force required. Any error in instructing on "wanton" disregard probably would not be prejudicial.

However, the expert evidence as to whether decedent fell and struck her head on the stairs was equally divided, and there is a substantial question whether the jury determined beyond a reasonable doubt that the fracture occurred as a result of active conduct by defendant rather than the fall. Moreover, as a matter of common sense, it must be recognized that the destructive force is greater when the injured person walks into the punch than when the head is free to roll with the punch. Even Doctor Chadwick,

although stating that the fracture could be caused by the hand, indicated his belief that the fracture was caused by decedent going to the padded surface rather than bringing the padded surface to decedent. I cannot agree with the majority's assertion (maj. opn., *ante,* at p. 1222) that the jury rejected the defense's claim that the fracture was caused by the fall.

In the circumstances of the instant case, there is a substantial likelihood that the jury, under the "wanton" instruction concluded that malice was implied on the basis of reckless behavior of defendant whether or not decedent's fracture was caused by a fall down the stairs. Although, as pointed out above, the testimony of the autopsy surgeon as to absorption of cocaine seems to rule out defendant as a source of the cocaine, the surgeon also testified that his findings were consistent with ingestion of the cocaine prior to the fracture, and defense counsel did not argue that the time element excluded defendant as a source of the cocaine. Thus, the jury probably concluded, as the majority concludes (maj. opn., *ante*, at p. 1222), that defendant furnished the cocaine. If so, the jury under the instructions given may have further concluded that malice was implied on the basis of the cocaine evidence, the evidence that defendant furnished some wine and the evidence that he failed to secure the gate at the top of the stairway, because they showed a "wanton disregard" of the risk to the life of decedent. The jury may have done so under the erroneous instruction even though it was of the view that defendant had not appreciated the risk or even though it was unable to agree whether defendant was aware of the risk to life caused by the combination of his several actions.

In his argument to the jury, the prosecutor treated the implied malice instruction as providing two definitions of implied malice. The jury deliberated for four days. After two, it requested a copy of the instruction defining murder, and it was given an instruction which erroneously permitted conviction on the basis of "wanton disregard" of the risk to life without requiring a finding that defendant appreciated the risk and consciously disregarded it.

The prejudice standard of "harmless beyond a reasonable doubt" of *Chapman* v. *California* (1967) 386 U.S. 18, 21 [17 L.Ed.2d 705, 709, 87 S.Ct. 824, 24 A.L.R.3d 1065] is applicable to an error in instruction completely removing the intent element of a crime from the jury's consideration and to contradictory and irreconcilable instructions on intent. (*People* v. *Lee* (1987) 43 Cal.3d 666, 671-676 [238 Cal.Rptr. 406, 738 P.2d 752].) The error in the instant case was clearly prejudicial under this test. Indeed, had the jury been properly instructed, it is reasonably probable that the jury would have concluded that defendant did not appreciate the risk to life

created by his conduct although he should have done so and that he was guilty of involuntary manslaughter rather than second degree murder.

The majority conclude that defendant was not prejudiced because the jury was also instructed pursuant to CALJIC No. 8.51 (1983 rev.) (4th ed. pocket pt.) as follows: "There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing such a dangerous act in an unlawful or criminally negligent manner without realizing the risk involved, he is guilty of manslaughter. If, on the contrary, he had realized the risk and acted in total disregard of the danger of life involved, malice would be implied and he could be guilty of murder." (Maj. opn., *ante,* at p. 1222, fn. 2.)

The instruction, purporting to distinguish murder and manslaughter, does not eliminate or even reduce the prejudice flowing from the "wanton disregard" instruction. If anything, the instruction exacerbates the prejudice in the circumstances of the instant case. The jury is told by the instruction that if there was criminal negligence without realization of the risk involved, the crime is manslaughter. The jury may well have concluded that defendant did not realize the risk involved as pointed out above, but it might also have concluded that defendant's conduct was more reprehensible than negligence, amounting to reckless and wanton misconduct. Viewing the instructions as a whole, the jury would erroneously determine that defendant was guilty of murder under the "wanton disregard" instruction even though he had not recognized the risk of death.

I would affirm the judgment of the Court of Appeal.

Appellant's petition for a reharing was denied February 15, 1990.