Filed 9/26/16  P. v. Lee CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TERRANCE TYRONE LEE,<br><br>    Defendant and Appellant. | F070145<br><br>(Super. Ct. No. F12907571)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Edward Sarkisian, Jr., Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Clifford E. Zall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Terrance Tyrone Lee appeals from a judgment of conviction of second degree murder (Pen. Code,[1] § 187, subd. (a)).  Lee killed one of his friends by engaging in a

---

[1] All further statutory references are to the Penal Code.

variation of Russian roulette, i.e., chambering a single round in a revolver, spinning the cylinder, aiming the gun, and pulling the trigger. Lee pulled the trigger twice, and the second time he fired a bullet into the victim's neck. The jury rejected defense arguments for a manslaughter verdict, presumably concluding Lee acted with implied malice. He was sentenced to 40 years to life in prison.

There are three claims on appeal. The first pertains to the cross-examination of a defense expert who testified to Lee's level of intelligence and cognitive abilities. Lee complains that the prosecution elicited mens rea testimony from the expert in violation of section 29. The second claim assigns error to the trial court's failure to clarify the phrase "conscious disregard for human life" in response to a jury question. Lastly, appellant contends that his sentence of 40 years to life constitutes cruel and unusual punishment. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant was charged with murder in the death of Marquis Sutton, who died on September 24, 2012. There was an additional count of assault with a firearm (§ 245, subd. (a)(2)), and firearm enhancement allegations were pleaded pursuant to sections 12022.5, subdivision (a) and 12022.53, subdivision (d). The case went to trial in August 2014.

Prosecution Case

The shooting took place at an apartment complex in northwest Fresno. The victim, Sutton, had just finished running an errand at a nearby drug store when he made an impromptu visit to the apartment where Lee often stayed with his girlfriend. Sutton was accompanied by a friend, Terrell Green, and Green's 13-year-old nephew. Lee and his cousin, Derrick Major, were inside of the apartment when the three visitors arrived. Then age 20, Lee was at least two years older than everyone else in the group.

Soon after Sutton had entered the residence, Lee showed off his recently acquired .38-caliber revolver. He removed all of the ammunition from the gun and then reloaded

2.

it with a single bullet. After closing and spinning the cylinder, Lee pointed the weapon at Sutton and jokingly said, "Let's see how fast he can run with his messed up ankle." The comment was made in reference to a football injury that was causing Sutton to walk with a limp. Eyewitnesses testified that Lee proceeded to squeeze the trigger of the gun, which resulted in a clicking sound.

The people in the apartment were unnerved by Lee's behavior. His cousin, Major, said, "What the fuck are you doing?" Sutton moved toward the front door and implored Lee to quit playing around. When Lee pulled the trigger again, the gun fired and Sutton fell to the ground. Next, Lee picked Sutton up and began to carry him outside. After recovering from the initial shock of what had happened, Major expressed concern that moving Sutton could cause further injury to him. Lee ignored his cousin's remarks and told everyone to "say it was a drive-by [shooting]."

A bystander named Kimberly Hansen saw Lee carry Sutton out of the complex and lay him down next to a sidewalk. Lee went back to his apartment after instructing Hansen to call 911, which she did. At some point during this sequence of events, Lee also spoke with a neighbor named David Black. Black testified that Lee told him his "cousin" had been injured in a drive-by shooting.

Lee left the apartment complex after being told that police had arrived in response to the 911 call. The first officer on the scene testified that Sutton was alive but breathing abnormally due to a gunshot wound in the side of his neck. He was transported to a local hospital and died later that day.

Investigators discovered an expended bullet inside of the apartment where the shooting occurred. The cap to a bottle of bleach was located near the front door of the residence. An open container of bleach was found in the bedroom, and someone had stuffed a bleached towel in between the box spring and mattress.

Police located and arrested Lee at his mother's home. From there he was taken to police headquarters and questioned by homicide detectives. While in custody, Lee

3.

reportedly made a spontaneous statement to the effect of, "I fucked up. I'm going to spend the rest of my life in prison." He later waived his right to remain silent and submitted to a videotaped interview, which was shown to the jury at trial.

Lee initially characterized the shooting as an accident, claiming the gun "just went off" while he was holding it. He adjusted his story after detectives disclosed that other witnesses had provided a different account of the incident. Lee admitted pulling the trigger and made a reference to "Russian roulette," but equivocated on whether he actually pointed the gun at Sutton. He tried to convince the detectives that the gun was aimed toward the ceiling when it discharged. When asked about the gun's current whereabouts, Lee said he had disposed of it and advised: "The gun is nowhere to be found right now." The weapon was never recovered.

Defense Case

Lee's relatives testified to his non-violent nature and described him as being a close friend of the victim. According to his mother, Lee graduated from high school in 2011 and sometimes assisted her in running her daycare business. He had plans to enroll in classes at Fresno City College.

In an effort to negate the element of implied malice, the defense presented expert testimony from psychologist Harold Seymour, Ph.D. Dr. Seymour was retained to evaluate Lee's intellectual functioning and reasoning capabilities. He did this by administering an intelligence test and "portions of a standardized cognitive mental status exam called the Cognistat."

Dr. Seymour testified that Lee's nonverbal intelligence scores were in the upper range of average, but his verbal performance was in the range of below average to borderline mental retardation. His vocabulary and reading skills were comparable to those of a second grader. Lee also tested below average for his age in the area of "executive functioning," which encompasses judgment, planning, and inhibition. Based on the results of Dr. Seymour's clinical evaluation, the defense argued that Lee did not

4.

fully appreciate the dangerousness of his actions when he pointed the revolver at Sutton and pulled the trigger.

**Verdict and Sentencing**

Lee was convicted of second degree murder and acquitted on the charge of assault with a firearm.[2]  He was found to have personally and intentionally discharged a firearm for purposes of section 12022.53, subdivision (d).  The trial court imposed a prison sentence of 40 years to life, consisting of 15 years to life for the murder conviction and a consecutive term of 25 years to life for the firearm enhancement.

## DISCUSSION

**Improper Expert Witness Testimony**

Lee claims the prosecution elicited opinion testimony from his expert in violation of section 29, which prohibits an expert witness from offering an opinion as to whether the defendant had a particular mental state at the time of the charged offense.  We agree that the trial court erred by overruling a defense objection to the challenged testimony.  However, we also conclude the error was harmless.

Additional Background

The testimony in dispute relates to a statement Lee made during his police interview.  In response to a question about the potential danger of pointing a loaded gun at someone, Lee allegedly said, "Somebody could get dead."  For purposes of context, we provide the following transcript excerpt of the exchange in which this response was given.

---

[2] The assault with a firearm count alleged that Lee subjected Derrick Major to the same type of Russian roulette conduct.  The charge was based on statements made by Major during a police interview, wherein he described an incident that allegedly occurred prior to Sutton's arrival to the apartment.  At trial, Major claimed to have forgotten most of what took place on the day of the shooting.

Q.   [W]hat was your mind thinking[,] because if I take my gun out right now and I spin it and I point it at you, okay, what am I thinking gonna happen out there possibility what could happen. [*Sic*] What are you thinking?

A.   [Somebody could get dead.]

Q.   Huh? *Somebody could get dead*, right, from doing that.  [Italics added.] Did you think about that?  Did you consider that?

A.   Uh-uh.

Q.   Huh?  But, what did you think could happen by pointing a loaded gun at somebody?

A.   Wasn't nobody thinking how - - that is a fact (INAUDIBLE)

Q.   Huh?

A.   Wasn't nobody thinking, everybody just laughing.  I wasn't (INAUDIBLE) thinking it be like it wasn't 'posed be like this (INAUDIBLE) [*Sic*]

Q.   Have you ever done that before?  And you know what, when you said the gun was pointed at the ceiling, we just left the hospital, and we looked at Marquis' body, and where the bullet went that gun was nowhere near pointed at the ceiling.

A.   I don't even know where he got hit.

Q.   He got hit in the back, and it came out his neck so this, no way.

A.   I'm telling you officers - -

Q.   There is no way that gun was pointed at the ceiling for him to take a round in his back.

A.   I'm telling - -

Q.   You had to have that gun pointed at him.

A.   I'm telling you like when I did it probably did but I - - God is witness I didn't mean to like point it the second time I was pointing at him.  I really being funny [*sic*], and it just went off.

6.

At trial, during cross-examination of Dr. Seymour, the prosecution asked a hypothetical question based on Lee's police interview: "Now, if I was to tell you that the detective testified that the response by Mr. Lee to that question: 'What did you think could happen if you pointed a loaded weapon at somebody and pulled the trigger?' -- his response was, 'Somebody could get dead.' Does that indicate to you that Mr. Lee understood the danger of what he was doing?" Defense counsel objected on grounds that the question addressed the ultimate issue of guilt. The objection was overruled, the question was re-asked in a slightly different form, and Dr. Seymour replied: "[It tells] us that he understands that potentially it could be dangerous."

Standard of Review

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) This standard applies to a ruling on the admissibility of expert testimony under section 29. (*People v. Pearson* (2013) 56 Cal.4th 393, 443-444.) When a trial court's ruling is based on an error of law, the ruling constitutes an abuse of discretion. (*People v. Cooper* (2007) 148 Cal.App.4th 731, 742.)

"The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) Lee submits that the alleged error "undermined the fundamental fairness of [his] trial and should be assessed under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [i.e.], harmless beyond a reasonable doubt." Although we disagree with Lee's argument on this point, we conclude, for the reasons that follow, that admission of the challenged testimony was harmless under either standard.

7.

<u>Analysis</u>

The prosecution's case hinged on the question of implied malice. In the context of murder, malice is implied "when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) The difference between unintentional second degree murder and involuntary manslaughter lies in the distinction between implied malice and criminal negligence. " 'If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice.' " (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.) Therefore, the existence of implied malice depends on whether or not the defendant actually appreciated the risk involved in his conduct. (*People v. Jarmon* (1992) 2 Cal.App.4th 1345, 1350.)

Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged…." The prosecutor's attempt to elicit opinion testimony from Dr. Seymour concerning whether Lee understood the dangerousness of his actions clearly pertained to the existence of a required mental state. The question and the response were both prohibited under section 29, and the trial court erred by overruling Lee's objections. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 408 ["neither side may elicit from an expert that a defendant acted with, or lacked, a particular mental state."]; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1327 [Section 29 prohibits hypothetical questions that might be interpreted as calling for an opinion about the defendant's mens rea].)

As for prejudice, we agree with respondent that the jury did not need guidance from Dr. Seymour to draw the most logical inference from Lee's acknowledgment that pointing a loaded firearm at someone carries the risk of death. There is no reason to believe the jury would have interpreted the evidence differently but for its exposure to the expert's opinion. This reality weighs against a finding of prejudice.

Lee correctly observes that the expert's "opinion on this statement did not assist the jury." He argues, without further explanation, that the improper testimony "negated the value of Dr. Seymour's expert opinion that appellant's cognitive functions were impacted by his underdeveloped language skills and impaired executive function…." We are not persuaded, especially given the limited probative value of the expert's testimony in comparison to the objective evidence of Lee's mental state.

Dr. Seymour diagnosed Lee as having a "mild learning disability" in the areas of verbal skills and abstract thinking. His testimony explained that having underdeveloped language skills can impact a person's ability to reason. Dr. Seymour also noted Lee's deficits in executive functioning, which could have impacted his level of inhibition and proneness to impulsivity. Regardless of whether Dr. Seymour's clinical findings were accurate, Lee's familiarity with the concept of Russian roulette and his statement, "Let's see how fast he can run with his messed up ankle," were inherently indicative of his understanding that aiming a loaded firearm at someone and pulling the trigger endangers life. The immediate and extensive efforts to cover up the facts of the crime were reflective of his cognitive abilities and mental functioning at the time of the offense. Lee has not demonstrated any likelihood that the outcome of the case would have been different but for Dr. Seymour's opinion regarding the statement Lee made during his police interview.

9.

**Alleged Instructional Error**

Lee contends that the trial court erred by providing an inadequate response to a jury question. Recognizing the issue has been forfeited because of his trial attorney's failure to object, he alleges ineffective assistance of counsel. We reject the claim.

Additional Background

The trial court instructed the jury on implied malice using the language of CALCRIM No. 520. The instruction provided, in pertinent part: "The defendant acted with implied malice if: 1. He intentionally committed an act; 2. The natural and probable consequences of the act were dangerous to human life; 3. At the time he acted, he knew his act was dangerous to human life; AND 4. He deliberately acted with conscious disregard for human life." During its deliberations, the jury submitted a request for "further explanation of 'conscious disregard for human life.'" The trial court responded, "Please see page 2 of the instructions: "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.'"

Prior to giving its response, the trial court held a chambers conference with the attorneys to discuss the jury's request. The court made a record of its reluctance to further define the concept of conscious disregard for life based on its review of specific case law. It then asked the attorneys if they had any objections to its proposed response. Lee's trial counsel replied: "That's fine, Your Honor. As I recall the case was the Knoller, K-n-o-l-l-e-r, case?" The trial court responded affirmatively, and counsel confirmed that the proposed response was acceptable to the defense. Later in the proceedings, the trial court specified that its ruling had been based on the California Supreme Court's opinion in *People v. Knoller* (2007) 41 Cal.4th 139 (*Knoller*).

Analysis

Lee believes the trial court was obligated to provide a more substantive explanation in response to the jury's request. However, the failure to object to a trial court's proposed handling of a jury question forfeits any claim of error and may be

regarded as showing "tacit approval of the trial court's decision." (*People v. Boyette* (2002) 29 Cal.4th 381, 430; accord, *People v. Martinez* (2003) 31 Cal.4th 673, 698.) Forfeiture also occurs where, as here, the parties affirmatively consent to the trial court's response to a jury question. (*People v. Rogers* (2006) 39 Cal.4th 826, 877; *People v. Loza* (2012) 207 Cal.App.4th 332, 350; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373.) Being cognizant of the forfeiture rule, Lee submits that his trial attorney rendered constitutionally deficient performance by not objecting to the trial court's response.

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Reviewable claims of ineffective assistance are subject to a two-part analysis. The appellate court considers whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and if so, whether the defendant suffered prejudice. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) "Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted . . ., i.e., a probability sufficient to undermine confidence in the outcome.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

Lee fails to show the absence of a satisfactory explanation for his trial attorney's actions. In *Knoller*, *supra*, the California Supreme Court reaffirmed its decision in *People v. Dellinger* (1989) 49 Cal.3d 1212 (*Dellinger*), which had approved the use of the phrase "conscious disregard" in jury instructions on implied malice. The *Dellinger* opinion "emphasized that the 'better practice in the future is to charge juries solely in the straightforward language of the "conscious disregard for human life" definition of implied malice," rather than use alternative explanations found in prior case law.

(*Knoller*, *supra*, 41 Cal.4th at p. 152, quoting *Dellinger*, *supra*, 49 Cal.3d at p. 1221.)  As relevant to the claim in this appeal, *Dellinger* notes that an instruction using the phrase " 'conscious disregard for human life' " is " 'comprehensible' " to the average juror. (*Dellinger*, *supra*, 49 Cal.3d at p. 1222.)  Therefore, Lee's trial counsel had a rational basis for agreeing to the trial court's proposed handling of the jury's request.  (See *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."]

Appellant counters that despite its reliance on *Knoller,* the trial court did not comply with section 1138, which requires the court to answer jury requests for clarification on points of law.  This argument does not change our analysis.  "Where, as here, 'the original instructions are themselves full and complete, the court has discretion under … section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' "  (*People v. Davis* (1995) 10 Cal.4th 463, 522.)

Were we to assume deficient performance could be shown, we would reject the ineffective assistance claim for lack of prejudice.  Lee's claim necessarily assumes the jury misunderstood the concept of implied malice and convicted him of murder through some type of flawed reasoning.  He fails to explain how the jury might have otherwise interpreted the facts if the concept of "conscious disregard for human life" had been properly explained to them.  In *People v. Roberts* (1992) 2 Cal.4th 271, the California Supreme Court described the "classic example" of implied malice as involving "a person who fires a bullet through a window, not knowing or caring whether anyone is behind it." (*Id*. at p. 317.)  The facts of this case are equally demonstrative, i.e., they present a textbook illustration of conscious disregard for human life.  As such, it is not reasonably probable that the jury's verdict would have been different but for the allegedly deficient performance of Lee's trial counsel.  (Cf. *People v. Thomas* (2012) 53 Cal.4th 771, 814-815.)

**Sentencing**

Lee alleges that his statutorily mandated prison sentence of 40 years to life is unconstitutionally cruel and/or unusual. His arguments are based on *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*) and the erroneous contention that he will not be eligible for parole until he is 62 years old. The claim is meritless.

Convicted criminals face a "considerable burden" to show that a statutory penalty to which they have been subjected violates their constitutional rights. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) As used in the Eighth Amendment to the federal Constitution, the phrase "cruel and unusual punishments" refers to "extreme sentences that are 'grossly disproportionate' to the crime." (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001.) The California Constitution forbids cruel *or* unusual punishment (Cal. Const., art. I, § 17), which precludes a sentence that is " 'so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085, quoting *In re Lynch* (1972) 8 Cal.3d 410, 424.)

In *Dillon*, *supra*, a 17-year-old defendant with no prior criminal record was convicted of first degree felony murder for shooting a man in "response to a suddenly developing situation that [he] perceived as putting his [own] life in immediate danger." (*Dillon*, *supra*, 34 Cal.3d at pp. 482-483, 488.) The boy received a mandatory life sentence, but "both the judge and the jury manifestly believed that a sentence of life imprisonment as a first degree murderer was excessive in relation to defendant's true culpability." (*Id*. at pp. 484, 487.) Given the particular circumstances of the case, the California Supreme Court found the punishment to be unconstitutional. The defendant's conviction was reduced to second degree murder and the cause was remanded for resentencing, with the trial court having the option to order the defendant committed to the California Youth Authority in lieu of a prison term. (*Id*. at pp. 485, 489.)

13.

The present matter bears little resemblance to the facts in *Dillon*. Unlike the 17-year-old defendant in that case, Lee was in full control of the situation that he created and had no misconceptions about the need for self-defense. He acted not out of fear or panic, but sheer foolishness.

Lee also overstates the severity of his sentence. The record reflects that he was 20 years old at the time of the offense and was sentenced on September 23, 2014, at the age of 22 years and four months. He was awarded 729 days of presentence custody credit against his prison term of 40 years to life. Under section 3051, subdivision (b)(3), "[a] person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the [Board of Parole Hearings] during his or her 25th year of incarceration . . ." Therefore, Lee will be eligible for parole at the age of 45.

In addition to citing *Dillon*, appellant purports to rely on the holdings in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*). In *Graham*, the United States Supreme Court held that sentencing a juvenile to life without the possibility of parole for a *nonhomicide* offense violates the Eighth Amendment's prohibition against cruel and unusual punishment. (*Graham*, *supra*, 560 U.S. at pp. 74-75.) The *Miller* case holds that it is cruel and unusual to impose a mandatory sentence of life without parole for a homicide committed prior to the defendant's 18th birthday, and requires that sentencing courts be given discretion to consider the juvenile offender's age and youthful characteristics before ordering such punishment. (*Miller*, *supra*, 567 U.S. at p. _ [132 S.Ct. at p. 2475].) These cases do not assist Lee because he was not a juvenile at the time of the offense nor was he sentenced to life without the possibility of parole. Furthermore, the recent decision in *Montgomery v. Louisiana* (2016) 577 U.S.___ [136 S.Ct. 718] indicates that the existence of statutory mechanisms for early release such as those provided in section 3051 "ensures that juveniles whose crimes reflected only transient immaturity—and who have since

14.

matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." (*Id.*, at p. __ [136 S.Ct. at p. 736].) Accordingly, and for the other reasons we have discussed, the sentence imposed in this case is not unconstitutional.

## **DISPOSITION**

The judgment is affirmed.


_____
GOMES, J.

WE CONCUR:


_____
HILL, P.J.


_____
DETJEN, J.

15.