Filed 2/28/25  P. v. Torres CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO TORRES,<br><br>    Defendant and Appellant. | A172257<br><br>(San Bernardino County<br>Super. Ct. No. FWV18004278) |

Defendant Alejandro Torres shot and killed Jorge Dubon Marquez (Marquez), whom he did not know, after following Marquez from a strip mall where both men were parked.  A jury convicted Torres of first degree murder and found true that he personally and intentionally discharged a firearm causing death.  The trial court sentenced him to 50 years to life in prison.

On appeal, Torres claims the trial court erred by not instructing the jury that to find him guilty of second degree implied malice murder, it had to conclude he knowingly committed an act " ' "involv[ing] a high degree of probability that it will result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).)  Assuming, without deciding, that instructional error occurred, we conclude it was harmless beyond a reasonable doubt and affirm.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The Murder*

Around 10:00 p.m. on November 15, 2018, Marquez drove his black SUV to a restaurant in a Fontana strip mall to pick up his food order.  He was friends with C.F., whose mother owned the restaurant.  After getting his food, Marquez stood in the parking lot talking with C.F. and C.F.'s mother, who had just closed the restaurant for the night.

As the three were talking, a white pickup truck parked a few spots away, by a liquor store.  A man, later identified as Christian Vargas, got out of the passenger's side.  He appeared to be drunk, because he was "stumbling" and almost fell.  According to C.F., no one in his group said anything to Vargas, and Vargas said nothing to them.  C.F.'s mother agreed that no words were exchanged, although she indicated that she and her son laughed at Vargas when he stumbled.  She also testified that Vargas gave her group "a serious and angry look" before getting back into the pickup.

The pickup's driver, later identified as Torres, also exited the vehicle and headed to the liquor store.  Unlike Vargas, Torres appeared to be walking normally.  One of the store's employees was outside when Torres arrived.  The employee greeted Torres, who was a regular customer, and the two went inside the store.  The employee indicated that Torres did not "seem drunk" or "angry at all," and he was acting "like his normal self."  Torres bought cigarettes and left.[1]

---

[1] Surveillance footage showing Vargas and Torres in the parking lot, Torres in the liquor store, and the white pickup at various points after it left the parking lot was played for the jury.  This footage is not in the record before us, although it apparently tended to corroborate the eyewitnesses' testimony.

Meanwhile, C.F. and his mother got inside their vehicle to leave. C.F. noticed Torres, who was back in the pickup's driver's seat, looking at him with "mad" eyes as if Torres was "a little bit angry." In response, C.F. "lowered [his] gaze" because he wanted to avoid any problems with Torres. Noticing Torres's look, C.F.'s mother told her son to let the pickup leave first. According to C.F., no one in his group exchanged any words with Torres either.

Marquez had also gotten in his SUV, and he started driving out of the parking lot. As he passed behind the white pickup, it reversed "quick[ly]" out of its spot and almost hit the SUV. The liquor store employee testified that he heard tires "screeching" and looked outside to see Torres's vehicle leaving.

C.F. and his mother also drove out of the parking lot, behind the white pickup. The pickup followed Marquez's SUV after it exited the parking lot onto Sierra Avenue and made a right on Merrill Avenue. C.F. and his mother "got stuck at the light" at Sierra and Merrill and lost sight of the other two vehicles after they continued down Merrill.

Farther east, a man and woman driving south on Tamarind Avenue with their young children stopped at the northern stop sign at that street's intersection with Merrill. The man, who was driving, testified that he saw "two vehicles" approaching from the west on Merrill "at an abnormal speed," and he decided to let them pass before proceeding. A "dark colored vehicle" in the southern lane and "a white pickup truck" in the northern lane then made a "rolling stop" at the intersection's western stop sign, "fairly even" with each other.

As the vehicles were still "rolling," around 5 to 15 miles per hour, the couple heard a few "pops." The dark-colored vehicle then continued straight, eastbound on Merrill, while the white pickup turned right, southbound on

3

Tamarind, its tires "screeching" as it accelerated and sped away. The couple also continued southbound on Tamarind, and the woman saw the pickup turn right a few blocks later onto a dead-end street. Worried the pickup was "going to come back out," the couple decided to turn off Tamarind and "rushed" home.

Marquez, who had been shot, managed to drive his SUV to his sister's house. A family member who heard the SUV's engine revving discovered Marquez collapsed over the steering wheel. Marquez was "choking," and he unsuccessfully attempted to say something. His family called 911, and he was transported to the hospital but died from his wounds. An autopsy showed that he was killed by one bullet that traveled through his right arm and his lungs before lodging in his upper left back. Fragments of a second bullet that hit the pillar between the front seat and backseat on the driver's side were later found in Marquez's SUV.

B.   *Evidence Related to Vargas*

At the time, Vargas lived in an apartment with his then-wife, L.V., and their four children. L.V. testified that around 8:00 p.m. on the night of the murder, Vargas drove his minibike to her mother's house nearby. About half an hour later, he called and told L.V. he had crashed the bike, and she picked him up. He said he had injured his thumb and back, but he refused to seek medical treatment even though she wanted him to do so.

Torres, who was friends with Vargas, arrived at the apartment complex around 9:00 p.m. Vargas went outside, and the two hung out near the complex's parking lot. About half an hour later, when L.V. went to check on Vargas, she saw that the two men had a bottle of vodka. L.V. did not notice whether Torres had been drinking, but she could tell Vargas had been,

4

although he "was still talking normal and everything." She asked her husband to come inside, but he refused, and she returned to the apartment.

L.V. testified that Vargas "had a tendency to drink too much," so she went outside again after another 15 minutes or so to check on him. Vargas was in the driver's seat of her car, which was already pulled out from her parking space, and Torres was in the passenger's seat. L.V. ran to the car and told Vargas not to leave, because she did not want him to drive drunk. He and Torres got out of the car, and L.V. parked it and went back inside. The next time she checked on Vargas, her car was still there, but he and Torres were gone.

Later that night, after L.V. had gone to bed, she was awakened by Vargas and Torres returning to the apartment. She went into the hallway and saw Torres holding Vargas, who appeared drunk and "was stumbling." Torres, who did not appear to be inebriated, guided Vargas to a couch. Vargas, "slurring his speech," told Torres not to leave, but Torres said he had to go.

L.V. asked Torres if he wanted to spend the night, but he declined. He asked her for a shirt, and she gave him one of Vargas's. Torres took off his own shirt, which he left behind, and put on Vargas's. Torres then pulled something from his waistband, which L.V. could not see because it was dark. He told Vargas "to hold it for him," but Vargas was unresponsive, so Torres left the item by the couch.

L.V. testified that before leaving, Torres told Vargas "that if he [Torres] goes in, to buy him soups, and if anything happens to him, to take care of his family." L.V. understood the "soups" comment to mean that if Torres went to jail, he wanted Vargas "to put money on his books." Torres also attempted to

5

hand Vargas his keys to give to Torres's father, but Vargas again did not respond, and L.V. took them. Torres then left the apartment.

L.V. looked at the object Torres had left by the couch and saw that it was a gun. She did not want to touch it, so she wrapped it in a rag and pushed it under the couch, where her children would not see it. The next morning, she told Vargas where it was. She did not see it again until about a day later, when the police searched the apartment and recovered it from underneath a bedroom dresser.

Two days after the murder, Vargas was arrested and interrogated. He told the police he was "really drunk" that night and could not remember much of what happened. But he insisted that he did not kill anyone, and he eventually said that Torres was the shooter. Vargas remembered that Torres was driving when they left the liquor store, and he also remembered "seein' the flash" when Torres fired out the window. Vargas had "no idea" why Torres would have shot someone, although Torres had "always been lookin' for this" and often said things indicating he expected to go to jail someday. Vargas also eventually admitted that the gun was in his bedroom, explaining that Torres put it in the living room before leaving.

Based on his involvement in the murder, Vargas entered a plea to accessory after the fact. He testified at trial, during which he was in custody for an unrelated case, but answered most of the prosecutor's questions by saying he did not recall. A recording of a jailhouse call between him and L.V. before she testified was played for the jury. During the call, Vargas told L.V. that during her testimony she should "just . . . try not to say nothing. Just be like, 'I don't remember, I don't remember.' "

The same day that Vargas was interrogated, the police found an unloaded semiautomatic firearm in his apartment's master bedroom. The

gun's magazine had a fingerprint on it that was "not good enough to rule out or include" either Vargas or Torres as the person who left it.

Torres's vehicle, a white Chevrolet pickup truck, was found parked near Vargas's apartment complex. Gunshot residue was on the interior of both the driver's and passenger's doors, which could indicate that a gun was fired inside the vehicle but not the specific location from which it was fired. There was a fired cartridge casing on the driver's-side floorboard and another fired casing in the center console's cup holder. Both these casings and the bullet recovered from Marquez's body were fired by the gun recovered from Vargas's apartment.

### C.    Procedural History

In July 2021, Torres was charged by information with one count of murder. It was also alleged that he personally and intentionally discharged a firearm causing death.[2] In March 2023, his first trial ended in a mistrial when the jury was unable to agree on the degree of murder.

Torres was retried in the summer of 2023. The trial court instructed the jury on two theories of first degree murder under CALCRIM No. 521: willful, deliberate, and premeditated murder and murder by shooting from a vehicle. (See § 189, subd. (a).) The court also instructed the jury on malice murder under former CALCRIM No. 520, to which Torres did not object. In relevant part, the instruction provided that Torres acted with express malice "if he unlawfully intended to kill" and with implied malice if: "1.  He

---

[2] Torres was charged with murder under Penal Code section 187, subdivision (a), and the firearm allegation was made under Penal Code section 12022.53, subdivision (d). Firearm enhancements were also alleged under subdivisions (b) and (c) of Penal Code section 12022.53, but they were dismissed on the People's motion. All further statutory references are to the Penal Code.

intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life." A "natural and probable consequence" was defined as "one that a reasonable person would know is likely to happen if nothing unusual intervenes."

The jury convicted Torres of first degree murder and found true that he personally and intentionally discharged a firearm causing death. In August 2023, the trial court sentenced him to 50 years to life in prison, composed of a term of 25 years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement. Torres appealed, and in January 2025, the appeal was transferred from the Fourth District Court of Appeal to this court for decision.

## II.
### DISCUSSION

Torres's sole claim on appeal is that the version of CALCRIM No. 520 given improperly defined implied malice. He claims that even though the jury convicted him of first degree murder and thereby concluded he acted with express malice, the error was prejudicial. We are not persuaded.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be either express or implied. (§ 188, subd. (a); *People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature"—i.e., when the person intends to kill unlawfully. (§ 188, subd. (a)(1); *Gonzalez*, at p. 653.) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).)

8

Express malice requires an intent to kill, but implied malice does not. (*Gonzalez*, at p. 653.)

As relevant here, a person who acts with express malice is guilty of first degree murder "if the intent to kill is formed after premeditation and deliberation" or if the murder "is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death." (*People v. Gonzalez, supra,* 54 Cal.4th at p. 653; § 189, subd. (a).) A person who acts with implied malice is guilty of second degree murder. (*Gonzalez*, at p. 653.)

Torres's claim of instructional error rests on recent developments in the law of implied malice. The concept's statutory definition, "a killing by one with an 'abandoned and malignant heart' [citation], is far from clear in its meaning." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).) To emphasize that the appropriate focus is "on a defendant's awareness of the risk created by [the defendant's] behavior," not the defendant's character, " '[t]wo lines of decisions developed . . . attempt[ing] "to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply." ' " (*Id.* at pp. 151–152.) Under the first line, based on Justice Traynor's concurrence in *People v. Thomas* (1953) 41 Cal.2d 470 (*Thomas*), "malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*Knoller*, at p. 152.) Under the second line, based on *People v. Phillips* (1966) 64 Cal.2d 574 (*Phillips*), "[m]alice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that [the person's] conduct

9

endangers the life of another and who acts with conscious disregard for life." ' " (*Knoller*, at p. 152.)

Our state Supreme Court has repeatedly stated that the *Thomas* and *Phillips* tests "in essence articulate[] the same standard." (*Knoller*, *supra*, 41 Cal.4th at p. 152; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219.) Still, the Court has also "suggested that the *Phillips* formulation of the *subjective* component of implied malice ('conscious disregard for life') is preferable to the *Thomas* formulation ('wanton disregard for human life') for purposes of instructing a jury." (*People v. Cravens* (2012) 53 Cal.4th 500, 512 (conc. opn. of Liu, J.).) Accordingly, CALCRIM No. 520 has always required a jury to find that the defendant acted "with conscious disregard" for life. And until recently, the form instruction also included the *Phillips* formulation of the objective component of implied malice, that "the natural and probable consequences of the act were dangerous to human life. (CALCRIM No. 520 (2023 ed.).)

In June 2023, a month before the jury here was instructed, our state Supreme Court decided *Reyes*. In concluding that the defendant's second degree murder conviction could not stand, *Reyes* stated that "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989.) Thus, the Court explicitly adopted the *Thomas* formulation of implied malice's objective component.

In response, the Judicial Council amended CALCRIM No. 520's definition of the objective component of implied malice. Now, the form instruction requires that "[t]he natural and probable consequences of the (act/[or] failure to act) were dangerous to human life in that the (act/[or]

10

failure to act) involved a high degree of probability that it would result in death." (CALCRIM No. 520 (2024 ed.).) CALCRIM No. 520's definition of implied malice's knowledge element did not change, still requiring that the defendant "knew [the] (act/[or] failure to act) was dangerous to human life." (*Ibid.*; see *Knoller*, *supra*, 41 Cal.4th at p. 157 [holding that implied malice does not require defendant's awareness of high probability of death].)

Relying on *Reyes*, Torres contends that the trial court erred by not instructing the jury that to find he acted with implied malice, it had to find that the act involved a high degree of probability of death. Torres also claims that in turn, the court erred by not instructing the jury that it had to find he knew the act involved a high degree of probability of death, not just that it was dangerous to human life.

We need not determine whether Torres forfeited his claim by failing to object below, as the Attorney General argues, or whether the trial court erred by not including the "high degree of probability of death" language in instructing the jury on implied malice. Even assuming the challenged instruction violated Torres's federal constitutional rights "by lessening the prosecution's burden to prove elements of the crime," we conclude the error was harmless because it is "clear beyond a reasonable doubt that a rational jury would have found [him] guilty absent the error."[3] (*People v. Cooper* (2023) 14 Cal.5th 735, 742; *Neder v. United States* (1999) 527 U.S. 1, 18; *Chapman v. California* (1967) 386 U.S. 18, 24.)

By convicting Torres of first degree murder under the instructions given, the jury necessarily found that he acted with an intent to kill. Thus, the jurors agreed he acted with express malice, meaning any error in the

---

[3] As a result, we also need not address Torres's claim that his trial counsel rendered ineffective assistance by failing to object to the instruction.

11

instruction on *implied malice* did not affect the verdict. (See *People v. Wright* (2006) 40 Cal.4th 81, 98 [instructional error harmless beyond a reasonable doubt where " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions' "].)

Moreover, even if the jury had potentially relied on the implied-malice portion of former CALCRIM No. 520, the omission of the "high degree of probability of death" language was patently harmless in light of the evidence at trial. The act resulting in death was Torres's shooting directly at Marquez while the two men were in adjacent cars. We have no reasonable doubt that any rational juror instructed with the additional language would have concluded that this act posed a high degree of probability of death and that Torres knew as much.

Torres claims that "by indicating that implied malice could be satisfied with an act that involved only some danger rather than a high probability of death," the challenged instruction "gave the jury what was effectively an all-or-nothing choice: either [he] had an express intent to kill, or he did something of undefined dangerousness and consciously disregarded that danger." According to him, "a juror might have looked at the facts—a weapon fired into the cab of a motor vehicle at close range—and thought 'dangerous to human life' simply did not cover the obvious lethality of the conduct and thus decided that express malice was the only option that matched the facts." Torres also emphasizes that the jury in his first trial was unable to agree on the degree of murder, which he claims shows his "mental state . . . was up for debate."

We agree with the Attorney General that there was no "all-or-nothing choice." In the Attorney General's words, "the jury had the option to convict

[Torres] of *second degree murder* if it did not believe that the prosecution had proven first degree murder beyond a reasonable doubt, and [find] that [he] acted with implied malice . . . as defined in the [challenged] instruction (which, according to [Torres], set a *lower* bar for conviction)." The jury was also instructed that if it "decide[d] that the defendant committed murder, it was murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree." No rational juror who was unconvinced beyond a reasonable doubt of Torres's guilt of first degree murder would have convicted him of first degree murder anyway just because the language defining implied malice failed to "match the facts." In short, Torres's claim fails because any error in the instruction on implied malice did not affect the verdict beyond a reasonable doubt.

## III.
### DISPOSITION

The judgment is affirmed.

_____
Humes, P.J.

WE CONCUR:


_____
Langhorne Wilson, J.


_____
Smiley, J.

*People v. Torres*  A172257

14