Filed 9/2/25  P. v. Marquez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DONALD JOSEPH MARQUEZ,<br><br>    Defendant and Appellant. | C099692<br><br>(Super. Ct. No. 21F2142) |

A jury found defendant Donald Joseph Marquez guilty of second degree murder. On appeal, he argues his conviction is unsupported by sufficient evidence of the objective and subjective components of implied malice murder.  Alternatively, he asserts instructional error.  We will affirm the judgment.

## I.  BACKGROUND

On March 8, 2021, the victim was found on his knees, hunched over, near the front of his trailer with his arm resting on a shelf.  His face was swollen, he had a lump on his

1

head, and there was blood on his face, ears, mouth, and nose, and down the front of his clothes. He appeared to be trying to talk, but could not.

The first deputy sheriff who responded to the scene reported the victim was going in and out of consciousness and could not respond to questions with words. When the deputy asked the victim if a weapon had been used, the victim made his hands into two fists.

The second deputy sheriff who responded to the scene testified there was broken glass on the floor in the kitchen that appeared to be the missing glass from the oven. There was blood on the table and the wall next to it, in the hallway towards the bedroom, and on the stairs to the bedroom. With the exception of the bedroom and bathroom, there were items knocked over and broken glass in the rest of the trailer.

The victim was taken to the hospital where his head injury necessitated the placement of a breathing tube. The next day, the victim was transferred to Mercy Medical Center in Redding, where he was still intubated and in a medically induced coma when law enforcement visited him. The victim died on March 18, 2021, after his breathing tube was removed.

Two individuals testified regarding statements defendant made to them in the days following the incident. The first individual testified that defendant said he had gone to the victim's trailer and asked him if he had molested children. The victim replied, "Yeah, so what?" Defendant then proceeded to assault the victim. It was "one-sided." Defendant "mentioned knocking him into the stove" and said the victim "hit his head against it." Defendant knocked the victim out and waited for him to get back up and then proceeded to hold him up with his left hand and hit him with his right hand. Defendant did not let the victim back up and made sure to leave him there bleeding.

The second individual testified that, on March 9, 2021, defendant said his hands were hurt from the night before. There was a bandage on them. Defendant said, "I gave him all rights, no lefts." The second individual took this to mean that the person

2

defendant hit had gotten what he deserved. Defendant said he beat the victim "to a pulp." Defendant said the victim was barely able to talk, but defendant kept hitting him and beat him until "he was leaking pretty good." Defendant said he knocked the victim out, and when the victim regained consciousness, defendant asked the victim if he ever wanted to touch kids again.

The parties stipulated that defendant was 43 years old, 6 feet 1 inch tall, and weighed 270 pounds on March 8, 2021.

The forensic pathologist who performed a postmortem examination on the victim reported that the victim was 61 years old, 5 feet 3 inches tall, and weighed 153 pounds at the time of his death. The victim had bruising on his eyelids. He had lacerations on his upper and lower lips that were healing. The pathologist explained lacerations are blunt force applied to the skin that splits it. The victim's left ear was slightly swollen, and there were abrasions inside and outside of the ear.

The inside surface on the right side of the victim's head, just over the frontal scalp, had a four-by-two-inch area of hemorrhage in the scalp. The left side had multiple patchy areas of bruising all the way from the front to the back of the scalp. The forensic pathologist explained that blunt force trauma typically causes hemorrhaging in the scalp.

There was subdural hemorrhaging over the back of the victim's brain. The victim also had subarachnoid hemorrhaging over the same area, the left and right occipital lobes, and the left cerebellar lobe. This type of bleeding in the brain indicated force had been applied and the brain and its surrounding membranes were injured.

There was also hemorrhaging along much of the surface above the victim's heart. This hemorrhaging is also typically caused by blunt force trauma. On his right side, the victim had fractures of the second and third ribs. On his left side, the second through eighth ribs were fractured. The upper part of victim's abdomen was "diffusely hemorrhagic" all the way across. This bleeding and the rib fractures were consistent with blunt force trauma.

3

When the victim was admitted to the hospital, his Glasgow Coma score was the lowest score possible. The score assesses eye movements, verbal response, and motor response. The forensic pathologist explained that 15 is normal, intermediate injury is nine to 12, and three to eight is severe traumatic brain injury. After a few days in the hospital, the victim's score remained in the range for severe traumatic brain injury.

The forensic pathologist determined the victim died from complications of severe blunt head trauma due to an assault.

On cross-examination, the pathologist agreed that a tracheotomy and a gastric feeding tube had been recommended for the victim but had not been used. On redirect, the pathologist explained that the prognosis is poor for severe traumatic brain injury and, even if the victim had been kept alive with a ventilator and a feeding tube, he might never have regained a useful level of consciousness. In response to a question about the hemorrhaging around the victim's brain, the pathologist explained this hemorrhaging was "just an indicator of the trauma," and injuries to the axons that extend from the nerve cells and conduct impulses were "[t]he real culprit in [the victim's] death." The pathologist explained there was "both functional, physiological, as well as microscopic damage." Further, the pathologist explained blunt force trauma caused substantial damage and dysfunction of the brain.

The defense called as a witness the director of trauma service at Mercy Medical Center. This physician was not involved in the victim's care after his initial admission. This physician testified that the victim was on a ventilator when he was admitted and diagnosed with a traumatic brain injury. The physician stated he did not consider the victim's life to be threatened at the time of his arrival. The physician testified that the victim's best documented Glasgow Coma score "was in the range of 9 to 10," which may not have been "indicative of actual recovery" but was "encouraging." On cross-examination, the physician acknowledged that, the day after, the victim's best score was seven. The physician said the neurosurgeons at his hospital thought the victim's exams

were "consistent with diffuse axonal injuries," and the mortality rate for such injuries is as high as 30 percent. The physician noted "the decision was made that [the victim] would not want to have the additional measures that we had recommended, which included the tracheostomy and the gastrostomy, and that care was withdrawn." The physician testified there was "a very good chance that [the victim] would have survived this," but it was "very hard to predict" what the victim's "ultimate neurological outcome would have been."

## II. DISCUSSION

### A.    *Sufficiency of the Evidence*

Defendant argues his conviction for second degree murder is unsupported by sufficient evidence of the objective and subjective components of implied malice murder. We disagree.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and

5

deliberation, that would support a conviction of first degree murder.  (See [Pen. Code,] §§ 187, subd. (a), 189.)"[1]  (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).)  Malice may be either express or implied.  (§ 188, subd. (a).)  "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).)  "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).)  The People relied upon both theories at trial, but only implied malice is addressed on appeal.

Implied malice has " ' "both a physical and a mental component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' " ' "[2]  (*People v. Soto* (2018) 4 Cal.5th 968, 974, quoting *People v. Watson* (1981) 30 Cal.3d 290, 300.)  Defendant argues neither component was satisfied by the evidence.

Defendant asserts the objective component of implied malice is not met because "fists alone are insufficient to support a conviction for murder."  "This state has long recognized 'that an assault with the fist . . . may be made in such a manner and under

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  This definition of implied malice is known as "the *Phillips* test."  (*Knoller, supra*, 41 Cal.4th at p. 152, quoting *People v. Phillips* (1966) 64 Cal.2d 574, 587 (*Phillips*) ["Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life" ' "].)  "The *Thomas* test" "in essence articulate[s] the same standard":  "[M]alice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' "  (*Knoller, supra*, at p. 152, quoting *People v. Thomas* (1953) 41 Cal.2d 470, 480, (conc. opn. of Traynor, J.).)

such circumstances as to make the killing murder.' [Citation.] However, 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508, quoting *People v. Munn* (1884) 65 Cal. 211, 212-213.) Put differently, " '[n]ormally, hitting a person with the hands or feet does not constitute murder in any degree. [Citations.] But if death . . . is a reasonable or probable consequence of the beating the offense may be murder. [Citation.] Thus, to constitute murder there has to be either an intent to kill or such *wanton and brutal use* of the hands [or feet] without provocation as to indicate that they would cause death.' " (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 796.) We find such aggravating circumstances and wanton and brutal use of the hands supported by the record here. (See *Cravens, supra*, at p. 508 ["Based on our review of the record, we find sufficient evidence that the manner of the assault and the circumstances under which it was made rendered the natural consequences of defendant's conduct dangerous to life"].)

Defendant acknowledged he beat the victim—a much smaller and older man—"to a pulp." The victim's injuries and the blood in his trailer reflect the severity and length of the one-sided beating. Defendant hit the victim hard enough to fracture multiple ribs, the cheekbone, and eye socket, and cause severe traumatic brain injury. He also knocked the victim into an oven, and the victim hit his head against it with enough force that the glass broke. Defendant held the victim up and hit him repeatedly after he had already lost consciousness. Defendant said the victim was barely able to talk, but he kept hitting him, and beat him until "he was leaking pretty good." Defendant left the victim on the ground bleeding. Ultimately, the victim could not breathe on his own. Substantial evidence supports the jury's finding that defendant performed an act, the natural and probable consequences of which were dangerous to human life.

As defendant notes, "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must

7

' "involve[] a high degree of probability that it will result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).) He argues the injuries that directly resulted from defendant's blows were not the cause of the victim's death because the forensic pathologist testified that it was "the secondary mechanism of the whiplash forces" rather than defendant's blows that produced the axonal injuries that caused defendant's death. This argument is not supported by defendant's citations to the record. The forensic pathologist mentioned "whiplash" in response to a question about whether trauma was observed to the neck area or cervical cord in particular. The forensic pathologist testified the victim's cervical cord was not damaged and the victim "apparently had what they term 'whiplash injuries,' which is just soft tissue injuries to the muscles in the back of the neck. But there was no damage to the spine itself, either fractures or ligamentous injury." Later, the forensic pathologist testified as to axonal injury that it is "what happens in acceleration, deceleration, rotation of the head, due to forces applied to it." Thus, the forensic pathologist did not suggest, as defendant does, that the victim was injured by a "secondary mechanism" rather than defendant's blows. Indeed, he testified this functional, physiologic, and microscopic damage can be caused by blunt force trauma to the head. More importantly, the pathologist's testimony does not suggest defendant's beating of the victim was only dangerous in some vague or speculative sense. The forensic pathologist explained the victim died from complications of severe blunt head trauma due to an assault. He also testified blunt force trauma "caused substantial damage and dysfunction of the brain." We reject defendant's challenges to the sufficiency of the evidence to support the objective component of implied malice.

As to the mental or subjective component of implied malice, this component is satisfied if defendant knew that his conduct endangered the victim's life, and he acted with a conscious disregard for life. (*People v. Cravens, supra*, 53 Cal.4th at p. 508.) A jury is entitled to infer a defendant's subjective awareness that his conduct endangered the victim's life "from the circumstances of the attack alone, the natural consequences of

8

which were dangerous to human life." (*Id*. at p. 511.) Here, the evidence also showed defendant knew he was beating his victim to a "pulp." The evidence supports the reasonable inference that defendant was not satisfied when the victim lost consciousness and could not stand. Rather, defendant continued beating the victim past that point and then left him for dead. Defendant's argument is based on the suggestion that the victim's injury was not "commonly understood . . . such as a skull fracture or subdural hematoma causing displacement of his brain." We agree with the People that the mental component for implied malice does not require that the defendant specifically understood his conduct would cause axonal injury and traumatic brain injury. It is sufficient for satisfying the mental component of implied malice that the evidence supported the conclusion that defendant was aware his conduct was dangerous to the victim's life, and he acted with a conscious disregard for life. That standard was met here.

The jury's verdict was supported by substantial evidence.

B.     *Alleged Instructional Error*

Alternatively, defendant argues in supplemental briefing that he was prejudiced because the jury was instructed with a then-current version of CALCRIM No. 520. In accordance with authority from our Supreme Court,[3] these instructions articulate the *Phillips* test:

"The defendant had *implied* malice if:

"1. He intentionally committed the act;

"2. The natural and probable consequences of the act were dangerous to human life;

"3. At the time he acted he knew his act was dangerous to human life; [¶] AND

"4. He deliberately acted with conscious disregard for human life."

---

[3] *Knoller, supra*, 41 Cal.4th at pp. 156-157; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1221-1222 (*Dellinger*).

In March 2024, the Judicial Council modified CALCRIM No. 520 following *Reyes, supra*, 14 Cal.5th 981, which was decided after the jury's verdict in this case. The current instruction modifies the requirement that "[t]he natural and probable consequences of the act were dangerous to human life" to add "in that" the act or failure to act "involved a high degree of probability that it would result in death." (CALCRIM No. 520.) "[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

Defendant argues he was prejudiced by the lack of jury instructions "with the clarified standard for the objective component of implied malice," namely that the defendant's act must have "involved a high degree of probability that it would result in death." The People argue defendant forfeited this assertion by failing to request a clarifying instruction at trial. "In general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights. [Citations.] But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.'" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428.)

Even if we could conclude defendant preserved his challenge, we would reject it on the merits because it is foreclosed by binding precedent from our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In *People v. Nieto Benitez* (1992) 4 Cal.4th 91 (*Nieto Benitez*), the defendant argued that CALJIC No. 8.31, which also uses the *Phillips* test, "misstates the law because the instruction omits a requirement that defendant commit the act with a *high probability* that death will result."[4]

_____

[4] The version of CALJIC No. 8.31 given in *Nieto Benitez* stated in relevant part: " 'Murder of the second degree is [also] the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act

10

(*Nieto Benitez, supra*, at p. 111.)  Our Supreme Court disagreed and concluded that "the present CALJIC No. 8.31 correctly distills the applicable case law."  (*Ibid*.)  In reaching this conclusion, the court noted it had previously concluded in *People v. Watson, supra*, 30 Cal.3d at p. 300 "that the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard."  (*Nieto Benitez, supra*, at p. 111; see also *Dellinger, supra*, 49 Cal.3d at pp. 1219, 1221-1222 [approving CALJIC definition of implied malice without any "high probability" language and noting that *Watson* "made it abundantly clear that the two definitions of implied malice" in the *Phillips* test and the *Thomas* test "articulated one and the same standard"].)

To the extent defendant suggests *Nieto Benitez* has been impliedly overruled by our Supreme Court's decision in *Reyes*, we disagree.  There, the court was reviewing the denial of a petition for resentencing under section 1172.6.  (*Reyes, supra*, 14 Cal.5th at p. 984.)  Our Supreme Court concluded there was insufficient evidence to support a theory that the defendant was guilty of murder as a direct perpetrator who harbored implied malice.  The court based its decision primarily on the lack of substantial evidence of proximate cause, but it also took issue with the trial court's conclusion that the "natural and probable consequences" of defendant's conduct was "dangerous to human life."  (*Id.* at p. 989.)  The Supreme Court explained:  "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' "  (*Ibid*.)  The court found that the defendant's conduct in traveling to rival gang territory with other

---

are dangerous to human life, and [¶] 3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.' "  (*Nieto Benitez, supra*, 4 Cal.4th at p. 100.)

11

gang members did "not by itself give rise to a high degree of probability that death w[ould] result." (*Ibid*.)

Reyes did not address the propriety of the standard jury instructions on implied malice and the court did not suggest that *Nieto Benitez* was wrongly decided. The *Reyes* court's reference to the "high probability of death" standard in deciding a sufficiency of evidence question under section 1172.6 does not amount to a holding that trial courts must include such language in the jury instructions defining implied malice. *Reyes* also did not call into question our Supreme Court's prior holdings that " 'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' " standards of implied malice are one and the same, and that it is proper to instruct the jury solely on the latter. (*Nieto Benitez, supra*, 4 Cal.4th at p. 111; *Dellinger, supra*, 49 Cal.3d at pp. 1219, 1221-1222.) To the contrary, the *Reyes* court quoted with approval language from another Supreme Court decision reaffirming that "under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death." ' " (*Reyes, supra*, 14 Cal.5th at p. 989, quoting *Knoller, supra*, 41 Cal.4th at p. 152.) We remain bound by our Supreme Court's decision in *Nieto Benitez*. We therefore find no error in the implied malice instruction given at defendant's trial.

12

## III.  DISPOSITION

The judgment is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

ROBIE, Acting P. J.

/S/

_____

MESIWALA, J.