Filed 4/9/25  P. v. Vargas CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARGARITO ANGELES VARGAS,<br><br>    Defendant and Appellant. | D083404<br><br><br>(Super. Ct. No. SCD296287) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert O. Amador, Judge.  Affirmed.

Robert L. Hernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric Swenson and Monique Myers, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Margarito Angeles Vargas of a second degree *Watson*[1] murder of a 19-month-old child, driving with a suspended license, multiple drunk driving crimes, and hit and run driving.  Vargas appeals from the judgment, asserting instructional error relating to the implied malice element of a *Watson* murder.  Finding no error, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In a prior incident in 2016, Vargas was arrested for driving under the influence with a 0.21 blood alcohol content and later pled guilty to driving under the influence.  Before entering his plea, Vargas signed and initialed a written change of plea form, which he reviewed with his attorney and the assistance of an interpreter.  His 2016 change of plea form included language informing him that driving under the influence of alcohol was "extremely dangerous to human life" and that further offenses resulting in death could lead to a murder charge.  The court suspended his driving privileges and ordered Vargas to complete a nine-month alcohol program, during which he was repeatedly warned about the risks of driving under the influence and again informed that he could be charged with murder if he killed someone while driving under the influence.  Vargas also attended a Mothers Against Drunk Driving presentation, in which a California Highway Patrol officer shared a case involving a child killed by a drunk driver.

Approximately six years later, on September 24, 2022, Vargas drove an SUV on a suspended license to a friend's party.  He arrived at 5:30 p.m., consumed alcohol while at the party, and left at 6:30 p.m.

Meanwhile, a few blocks from the party, 19-month-old A.R. and her older sisters had been playing outside their home.  Their grandmother left

---

[1]     *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

the house and crossed the street to her car on her way to pick up food.  The girls, wishing to accompany her, followed.  The older sisters had already crossed the street when A.R. entered the street alone despite her grandmother's warnings to stop.

At 6:42 p.m., Vargas's SUV struck A.R. as she crossed the street.  As a result of her injuries, A.R. died in the hospital hours later.  Shortly before the collision, a surveillance video captured Vargas running a stop sign and nearly striking a parked vehicle as he negotiated the turn onto A.R.'s street.  At that point, A.R. had already entered the roadway.

Vargas's vehicle showed no signs of slowing before hitting A.R.  A.R.'s grandmother testified the SUV was traveling at a high rate of speed, possibly 50 miles per hour, but an accident reconstruction expert opined the vehicle had been traveling 18 miles per hour, under the 25-mile per hour residential speed limit.

Vargas did not stop after the impact and drove off.  Antonio Jasso Rodriguez, a neighbor who had been outside working on his car, heard the impact and saw A.R. on the ground. Rodriguez got in a car and followed the SUV.  Rodriguez confronted Vargas while he was buying corn from a street vendor.  Vargas denied hitting a girl, calling Rodriguez "crazy," and quickly drove off.  Vargas ran two more stop signs before Rodriguez lost sight of him.

Shortly thereafter, Peter Provencio observed Vargas's erratic driving and watched him swerve into a bicycle lane toward a bus stop.  As he passed Vargas to "put distance" between them and avoid an accident, Provencio noticed that Vargas had red, glazed eyes and flushed skin and believed Vargas was intoxicated.  Not long afterwards, Vargas rear-ended Provencio's car while it was stopped at a light.  Vargas then repeatedly backed up and

then drove into Provencio's car, hitting Provencio's car a total of three times before fleeing the scene.

At approximately 7:20 p.m., Vargas arrived home where officers were waiting. Vargas exhibited multiple signs of intoxication and performed poorly on various field sobriety tests.

A vehicle search revealed an almost empty 24-ounce beer can in the center console, two empty beer cans on the backseat floorboard, and two unopened 24-ounce beer cans on the front passenger floorboard. At 9:32 p.m., two breath samples revealed breath alcohol concentrations of 0.233 and 0.246 percent. Officers arrested Vargas, and a subsequent blood test reflected a 0.206 blood alcohol content.

Vargas was charged and later tried on six counts: second degree murder (Pen. Code,[2] § 187, subd. (a); count 1); gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count 2)[3]; driving under the influence (DUI) causing injury (Veh. Code, § 23153, subd. (a); count 3); causing injury while driving with a blood alcohol concentration of 0.08 percent or greater (Veh. Code, § 23152, subd. (b); count 4)[4]; hit and run causing death (Veh.

---

[2]    All further statutory references are to the Penal Code unless otherwise specified.

[3]    Count 2 also alleged Vargas caused great bodily injury to the victim (§ 1192.7, subd. (c)(8)) and fled the scene (Veh. Code, § 20001, subd. (c)).

[4]    In both DUI counts, it was further alleged that appellant had been convicted of another DUI offense within the previous 10 years (Veh. Code, § 23560).

4

Code, § 20001, subd. (b)(2); count 5); and driving with a suspended license. (Veh. Code, § 14601.1, subd. (a); count 6).[5]

During closing arguments, defense counsel stipulated Vargas was guilty of counts 2, 3, 4, 5, and 6, and only asked the jury to return a not guilty verdict on count 1, the second degree murder charge.

The court instructed the jury on the elements of murder as stated in the version of CALCRIM No. 520 then in effect, which stated in relevant part:

"The defendant acted with *implied malice* if:

"1.  He intentionally committed the act;

"2.  The natural and probable consequences of the act were dangerous to human life;

"3.  At the time he acted, he knew his act was dangerous to human life;

"AND

"4.  He deliberately acted with conscious disregard for human life."

On November 15, 2023, the jury returned a guilty verdict on all six counts, including the second degree murder charge, and found true all allegations and aggravating factors submitted to it. Following a bench trial

---

[5]     Additionally, Vargas was tried on four aggravating factors:  1) the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)); 2) appellant's prior convictions were numerous and of increasing seriousness (*Id.*, rule 4.421(b)(2)); 3) appellant's previous performance on probation had been unsatisfactory (*Id.*, rule 4.421(b)(5)); and 4) appellant had a blood alcohol concentration of 0.15 percent at the time of the crimes (*Id.*, rule 4.408(a)).

on additional aggravating factors, the court sentenced Vargas to four years plus 15 years to life in state prison.

DISCUSSION

Vargas contends his second degree murder conviction must be reversed because the court erroneously instructed the jury with an "incomplete" definition of implied malice contained in the version of CALCRIM No. 520 then in effect. Relying on the California Supreme Court's decision in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*), which was decided several months before trial, Vargas argues the court should have defined the term "dangerous to human life" as used in CALCRIM No. 520 to mean "a high degree of probability that it will result in death." We reject this contention.

Initially, the Attorney General contends that Vargas has forfeited this argument by failing to request any such clarifying instruction at trial. It is settled that "[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503 (*Hillhouse*).) At the same time, however, a failure to object does not prevent a defendant from challenging an instruction on appeal if the asserted error affected the defendant's substantial rights. (§ 1259; *People v. Thomas* (2023) 14 Cal.5th 327, 382.)

We agree with the Attorney General that Vargas's challenge to the version of CALCRIM No. 520 given at trial appears to fall within the former category. He does not assert that any of the language in the instruction as given was legally incorrect. Specifically, he does not argue that the "dangerous to human life" standard is legally incorrect. Rather, he contends the instruction was "incomplete" because it did not further define the phrase "dangerous to human life." This is an argument that the instruction given at

6

trial, though legally correct, was "too general *or incomplete*, and thus needed clarification." (*Hillhouse, supra*, 27 Cal.4th at p. 503 [italics added].) Because no such request for clarification was made in the trial court, the issue is forfeited. (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 877 ["Defendant's failure to request clarifying language forfeits the issues on appeal."]; *People v. Hardy* (1992) 2 Cal.4th 86, 153 ["[B]ecause the instruction given was correct, it was incumbent on defendants to request clarifying language."].)

Even if Vargas had preserved his challenge, however, we would reject it on the merits because it is foreclosed by binding Supreme Court precedents. In *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110–111 (*Nieto Benitez*), the court rejected a similar argument that a finding of implied malice requires that a defendant commit an act that objectively involves a high probability that death will result. In that case, the defendant argued that CALJIC No. 8.31 "misstates the law because the instruction omits a requirement that defendant commit the act with a *high probability* that death will result."[6] (*Id.* at p. 111.) The Supreme Court disagreed and concluded that "the present CALJIC No. 8.31 correctly distills the applicable case law." (*Ibid.*) In reaching this conclusion, the court noted it had previously concluded in *Watson* "that the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended

_____

6      The version of CALJIC No. 8.31 given in *Nieto Benitez* stated in relevant part: " 'Murder of the second degree is [also] the unlawful killing of a human being when:  [¶]  1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and conscious disregard for, human life.' " (*Nieto Benitez,* at p. 100.)

to embody the same standard." (*Nieto Benitez,* at p. 111; see also *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219, 1221–1222 (*Dellinger*) [approving CALJIC definition of implied malice without any "high probability" language and noting that *Watson* "made it abundantly clear that the two definitions of implied malice" in the case law "articulated one and the same standard"].)

To the extent Vargas is suggesting that these cases have been impliedly overruled by the Supreme Court's decision in *Reyes*, we disagree. There, the court was reviewing the denial of a petition for resentencing under section 1172.6. The Supreme Court concluded there was insufficient evidence to support a theory that the defendant was guilty of murder as a direct perpetrator who harbored implied malice. The court based its decision primarily on the lack of substantial evidence of proximate cause, but it also took issue with the trial court's conclusion that the defendant's conduct was " 'dangerous to human life.' " The Supreme Court explained: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death. " ' " (*Reyes, supra*, 14 Cal.5th at p. 989.) The court found that the defendant's conduct in traveling to rival gang territory with other gang members did "not by itself give rise to a high degree of probability that death will result." (*Ibid*.)

*Reyes* did not involve a jury instruction issue and the court did not suggest that either *Nieto Benitez* or *Dellinger* was wrongly decided. The *Reyes* court's reference to the "high probability of death" standard in deciding a sufficiency of evidence question under section 1172.6 does not amount to a holding that trial courts must include such language in the jury instructions defining implied malice. *Reyes* also did not call into question the Supreme Court's own prior holdings that the "high probability" and "natural

8

consequences" standards of implied malice are one and the same, and that it is proper to instruct the jury solely on the latter. (*Nieto Benitez, supra*, 4 Cal.4th at p. 111; *Dellinger, supra*, 49 Cal.3d at pp. 1219, 1221–1222.) To the contrary, the *Reyes* court quoted with approval language from another Supreme Court decision reaffirming that "under the objective component of implied malice, 'dangerous to life' means the same thing as a 'high degree of probability that' the act in question 'will result in death.' " (*Reyes, supra*, 14 Cal.5th at p. 989 [cleaned up].) Because the Supreme Court in *Reyes* did not decide this instructional issue and did not overrule or disapprove any of its own prior case law, we remain bound by its decisions in *Nieto Benitez* and *Dellinger*. We therefore find no error in the implied malice instruction given at Vargas's trial.[7]

DISPOSITION

The judgment is affirmed.

---

[7] We recognize that since Vargas's trial, CALCRIM No. 520 has been modified in light of *Reyes* to state in relevant part: "The natural and probable consequences of the (act/[or] failure to act) were dangerous to human life *in that the (act/[or] failure to act) involved a high degree of probability that it would result in death.*" (Italics added.) In making this modification, however, the CALCRIM committee did not suggest that it was legal error to give the prior version, the substance of which was approved in *Nieto Benitez* and *Dellinger*. " '[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent.' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1157, fn. 7.)

9

                                                BUCHANAN, J.

WE CONCUR:


IRION, Acting P. J.


KELETY, J.