Filed 12/8/25  P. v. Garcia CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANGEL GARCIA,<br><br>    Defendant and Appellant. | B338264<br>(Los Angeles County<br> Super. Ct. No. BA360743) |

APPEAL from postconviction order of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Lauren N. Guber, Deputy Attorney General, for Plaintiff and Respondent.

Angel Garcia appeals from the denial of his Penal Code section 1172.6 petition following an evidentiary hearing.[1] Appellant challenges the sufficiency of evidence supporting the trial court's finding that he directly aided and abetted implied malice murder. We affirm.

## BACKGROUND[2]

### I. *Trial Evidence*

#### A. *The Participants*

Los Angeles County Deputy Sheriff Andrew Serrata, the prosecution's gang expert, testified that appellant and his co-defendants, Angel Hidalgo and Gabriel Delgado, belonged to the Maywood Locos gang. Yesenia Villarreal and Yvette Lemus admitted they were members or associates of the gang.

As of August 2009, the Maywood Locos gang claimed territory northwest of the intersection of Atlantic Boulevard and 57th Street in the City of Maywood. Its rival gang, the Krazy Wicked Surenos (K.W.S.), claimed territory southeast of the intersection. The gangs engaged in "shootings very frequently" with each other.

The victim in this case, Luis Mora, was not a documented gang member.

---

[1]     Subsequent unspecified references to statutes are to the Penal Code.

[2]     By separate order, this court granted appellant's motion to augment the record with the clerk's and reporter's transcripts of the underlying trial, as well as a trial exhibit of video surveillance footage.

**B.**     *The Shooting of Mora*

Around 2:50 p.m. on August 13, 2009, Villarreal drove her Honda Accord with Lemus, Hidalgo, and Delgado to appellant's home so that Delgado could retrieve his gun.  Delgado went inside and returned with appellant several minutes later.

Villarreal drove one block to a Shell gas station on the northwest corner of Atlantic Boulevard and 57th Street.  She and Lemus went inside the station to prepay for gas.  While the two women were inside the gas station, a security camera recording captured Hidalgo standing next to the car, apparently talking on his phone, and looking in the direction of a Valero station across the street.  He then leaned into the open front passenger seat's window where Delgado was sitting.  As he leaned into the car, Hidalgo alternately looked across Atlantic Boulevard and then into the car several times.  He then walked in front of the car, took several steps toward the corner, and paused to look in that direction.

While Hidalgo looked across Atlantic Boulevard, appellant got out of the car, walked toward the corner, looked forward for several seconds, and then walked over to the open driver's door.  Appellant leaned into the open door for a few seconds and then got back into the back seat.  By this time, Hidalgo had walked back to the car and stood outside Delgado's open car window.

Villarreal and Lemus returned to the car from inside the station.  Villarreal began pumping gas while Hidalgo stood outside the car talking on his phone.  Lemus got into the back seat and overheard appellant tell Delgado, "'[i]t's a dummy'" or "'[t]hat fool's a dummy,'" while Delgado looked toward the Valero station.  She understood that referred to an "'enemy'" gang

3

member.  Lemus then overheard Delgado tell Hidalgo, "'You got it.'"

Delgado got out of the car and followed Hidalgo around the front of the car as Hidalgo pointed to a spot across the intersection.  As the pair started walking away, Hidalgo told Villarreal to pick them up across the street at the spot he had pointed out.  Through the open rear door, Villarreal asked appellant where Hidalgo and Delgado were going.  Appellant replied that he, Hidalgo, and Delgado had spotted a "dummy," i.e., a rival gang member, across the street.  Villarreal took this to mean that Hidalgo and Delgado were going to challenge the person's gang affiliation.

Hidalgo and Delgado quickly crossed Atlantic Boulevard just north of the intersection.  They continued on the north side of 57th Street before disappearing from the security camera's view.

Luis Mora lived about fifty yards east of Atlantic Boulevard on the north side of 57th Street.  At about 3:00 p.m., Mora left his house to buy a shaved ice from a street vendor near the Valero gas station.  After buying the shaved ice, Mora returned to his house and was walking up the driveway when Delgado, following him, drew a revolver and shot Mora three times, killing him.

Back at the Shell gas station, Lemus heard the gunshots. She urged Villarreal, still pumping gas, to "hurry up."  Villarreal stopped pumping gas, although more than $6.00 remained pre-paid on the pump.  She and Lemus got back into the Accord and Villarreal drove to the spot Hidalgo had pointed out earlier.  She stopped briefly while Hidalgo and Delgado jumped in the car, and then quickly drove away.

After Hidalgo and Delgado got into the car, Delgado said, "I got him" and "that the guy had fell to the floor screaming."

4

Nobody said anything in response.  Villarreal drove everyone to Delgado's home to drink beer.

### C.    *The Gang Evidence*

The prosecution's gang expert, Serrata, testified that the Maywood Locos gang uses "fear," which it equates to "respect," to intimidate other gangs and the community.  Its members earn "respect" by committing violent acts like shooting others.  A gang member would usually have another member with him to "watch [his] back" in committing these crimes in another gang's territory.  Typically, gang members are armed and share guns.

Among street gangs, to "bang" on someone in a rival gang's territory is considered "putting in work[,]" i.e., committing violent crimes against other gangs.  This includes challenging an unknown person's gang affiliation by asking them "what gang are they from."  If a gang member sees someone they know to be a rival, they may skip the challenge and simply shoot the person.

The Maywood Locos had about 112 documented members and controlled its territorial boundaries.  It had a rivalry with the much smaller K.W.S., which had a membership of about 30 members.  While the Maywood Locos claimed the area west of Atlantic Boulevard and 57th Street intersection, K.W.S. claimed the area east of the intersection.

Maywood Locos members "put in work" against rival gangs by committing "violent crimes" such as "assaults with deadly weapons, attempted murder, [and] murder."  This could include shooting rival members in that gang's territory or someone perceived to be a rival member.  Since the late 1980's or early 1990's, the Maywood Locos assaulted K.W.S. members, which "turned from fist fighting to shooting[s]" that were "frequently"

committed in the area where Mora was killed.  In August 2009, "there were so many shootings back and forth [between Maywood Locos and K.W.S.] that gang members were even afraid to walk around in their own area, much less going into rival gang territory."

## II.   *Information, Verdicts, Plea, and Sentence*

By amended information, appellant, Hidalgo, and Delgado were charged with the murder of Mora (§ 187, subd. (a)) with gang (§ 186.22, subd. (b)(1)(C)) and firearm (§ 12022.53, subds. (b)–(e)(1)) enhancement allegations.  In July 2011, a jury convicted Hidalgo and Delgado but could not reach a unanimous verdict for appellant.  The court declared a mistrial as to him individually.

In August 2011, appellant pleaded no contest to voluntary manslaughter (§ 192, subd. (a)) and admitted he was armed with a firearm during its commission (§ 12022, subd. (a)(1)).  Appellant was sentenced to 12 years imprisonment.

## III.   *Resentencing Proceedings*

In September 2022, appellant filed a petition for resentencing under former section 1170.95, now section 1172.6. The court issued an order to show cause, reviewed the parties' briefing, and held an evidentiary hearing at which parties submitted on the trial record.  The court denied appellant's petition, finding him guilty beyond a reasonable doubt of direct aiding and abetting implied malice murder.

6

## DISCUSSION

Appellant challenges the sufficiency of evidence supporting the lower court's finding of guilt. Although the issue is close, the record contains substantial evidence from which the trial court could find that appellant knew of and shared Delgado's intent to shoot Mora and acted to further the shooting.

### I.    *Section 1172.6*

In January 2019, the Legislature amended the law of murder to ensure murder liability is not imposed on those who are not the actual killer, do not act with the intent to kill, or are not major participants who act with reckless indifference to human life. (*People v. Curiel* (2023) 15 Cal.5th 433, 448, quoting Stats. 2018, ch. 1015, § 1(f).) The Legislature also added former section 1170.95, now section 1172.6, for individuals to seek retroactive resentencing relief.

If a resentencing petition makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing at which the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under current law. (§ 1172.6, subds. (c), (d)(3)). This standard applies to a manslaughter conviction following a plea "at a time when the prosecution could have pursued a murder charge, but the only way of doing so would have been a now invalid theory of imputed malice." (*People v. Lezama* (2024) 101 Cal.App.5th 583, 590.)

At the evidentiary hearing, the trial court acts as an independent factfinder that reviews all previously admitted evidence, or any new or additional evidence submitted by the parties. (§ 1172.6, subd. (d)(3).) The court "must review all the

7

relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard . . . ." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  Consistent with the lower court's review, we review its denial following an evidentiary hearing for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

## II.	*Principles of Aiding and Abetting Implied Malice Murder*

Murder, the unlawful killing of a human being, is committed with express or implied malice.  (§§ 187, subd. (a), 188, subd. (a).)  Malice is implied when no considerable provocation appears or when the circumstances attending the killing show an "abandoned and malignant heart."  (§ 188, subd. (a)(2).)  This "'cryptic statutory'" language (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1221) refers to a killing proximately caused by "'"'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" [Citation.]" (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

"Guilt as an aider and abettor is guilt 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.'" (*People v. Powell* (2021) 63 Cal.App.5th 689, 710.)  "In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. . . .  [T]he direct aider and abettor must, by words or conduct, aid the commission of the

8

life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

If, as here, the life-endangering act is a shooting, the aider and abettor must know the shooter "intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Reyes*, *supra*, 14 Cal.4th at p. 992.)  "'Among the factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).)  "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208; see *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107 ["The very nature of implied malice, however, invites consideration of the circumstances preceding the fatal act"].)

## III.   *Analysis*

"Appellate inquiry into the sufficiency of the evidence 'does not require [this] court to "ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt." [Citation]  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*Nguyen*, *supra*, 61 Cal.4th at p. 1055.) Under this standard of review, we are compelled to find substantial evidence supports the trial court's finding that appellant directly aided and abetted implied malice murder.

Appellant joined fellow Maywood Locos members (or associates) after one of its members (Delgado) retrieved a firearm from appellant's home. From there, the group traveled to a nearby gas station where Hidalgo apparently spotted Mora across the street. Soon after that, appellant got out of the backseat of the car, walked a few steps toward the intersection, and looked across the street in the same direction Hidalgo was looking—into rival gang territory. Appellant then leaned into the car, apparently to speak to Delgado, knowing he possessed or had access to a gun. One reasonable interpretation of the evidence is that there was a discussion regarding what to do about the person across the street who had drawn the group's attention.

When Lemus rejoined appellant in the backseat of the car, she overheard him tell Delgado "'[i]t's a dummy'" or "'[t]hat fool's a dummy,'" while Delgado looked toward the Valero station. In his briefing, appellant concedes he was identifying Mora (mistakenly) as a rival gang member. In light of what happens next—and accepting any reasonable inference that supports the trial court's finding—this statement could be seen as an encouragement to take action against a perceived rival amidst ongoing gang warfare. Delgado said, "'You got it'" to Hidalgo at the end of the discussion and crossed the street with Hidalgo.

Moments later, Delgado pulled out his firearm and shot and killed Mora. He and Hidalgo ran back to the car in which

10

appellant was still a backseat passenger. As the car drove away, Delgado confirmed "I got him," and said "the guy had fell to the floor screaming." Nobody in the car said anything in response. One reasonable interpretation of this evidence is that appellant (and other members in the car) were not surprised about the shooting because they knew it would occur.

"Considering this evidence in the context of the ongoing gang war" (*Nguyen, supra*, 61 Cal.4th at p. 1055) in the light most favorable to the lower court finding, the trial court could reasonably infer that appellant knew Delgado intended to shoot Mora, intended to aid Delgado in the shooting, knew the shooting was dangerous to life, acted in conscious disregard for life, and aided in its commission by identifying Mora as a rival and encouraging Delgado to shoot him. (Compare *ibid.* [defendant "stared back" at occupants in victim's car before fellow gang member fired shots at the car].)

Appellant contends these inferences are based on impermissible speculation and gang culture generalities. We disagree. Gang evidence alone cannot prove aiding and abetting, but it can strengthen "inferences arising from other evidence specific to [appellant's] role in the crime at issue." (*Nguyen, supra*, 61 Cal.4th at p. 1055.) As an independent factfinder, it is the trial court's "exclusive province" to determine whether an inference drawn from the evidence "is, in fact, the only reasonable one, a determination that depends on its resolution of conflicting evidence and weighing the credibility of witnesses." (*People v. Mumin* (2023) 15 Cal.5th 176, 202; see *People v. Westerfield* (2019) 6 Cal.5th 632, 713.) Even if "based on specific circumstantial evidence," the lower court's inferences were drawn from the evidence, not speculation. (*People v. Story* (2009) 45

11

Cal.4th 1282, 1298; see *People v. Collins* (2025) 17 Cal.5th 293, 307–308 [reasonable inferences cannot derive from conjecture or surmise].)

**DISPOSITION**

The postconviction order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

VAN ROOYEN, J.**

We concur:

ZUKIN, P. J.

COLLINS, J.

_____

** Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.